**Joseph MIDGETT, Plaintiff,**

v.

**TRI–COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON; et al., Defendants.**

**Civil No. 98–140–JO.**

United States District Court, D. Oregon.

Nov. 16, 1999.

Craig A. Crispin, Shelley Dennis Russell, Crispin & Associates, Portland, OR, for plaintiff.

Bradley Frederick Tellam, Paula A. Barran, Barran Liebman, Portland, OR, for defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiff Joseph Midgett brings this action against defendant Tri–County Metropolitan Transportation District of Oregon ("Tri–Met"), alleging claims for disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and negligence under Oregon common law.

The case is before the court on Tri–Met's motion for summary judgment on plaintiff's claim for injunctive relief under the ADA (# 81), and alternative motion for summary judgment on all claims. For the reasons stated below, Tri–Met's motion is granted with respect to plaintiff's ADA claims. Plaintiff's negligence claim is dismissed without prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Parties

Plaintiff, an analyst for the Portland Bureau of Police, has multiple sclerosis and uses a wheelchair for mobility, and is a "qualified person with a disability" under the ADA. Plaintiff contends that he would like to travel to work by bus, but because of Tri–Met's alleged failure to adequately train its bus operators and failure to maintain the wheelchair lifts, "his efforts to use public transportation have been impeded." Amended Joint Pretrial Order (Amended "JPO"), ¶ IV.A.3.

Defendant Tri–Met, a municipal corporation organized under the laws of the State of Oregon, is a "public entity" subject to Title II of the ADA. As pertinent to this case, Tri–Met operates a "fixed route system" (*see* 49 C.F.R. § 37.3) that provides public transportation within Multnomah, Washington, and Clackamas Counties, an area encompassing 592 square miles. Declaration of Adrian Moy, ¶ 3.

### 2. Events Giving Rise to the Lawsuit

The parties agree to the following summary of events. On January 30, 1996, during extremely cold weather, plaintiff, intending to travel to work by bus, went to a regular stop for Tri–Met's 45 bus. The 45 bus stopped for plaintiff, but the lift was inoperable due to the weather. Amended JPO, ¶ III.6.

Plaintiff proceeded to a regular bus stop for Tri–Met's 41 bus. The 41 bus stopped for plaintiff, but the lift also was inoperable. Amended JPO, ¶ III.7.

Plaintiff next went into a nearby coffee shop, then headed home. While on his way home, a bus arrived at his original 45 bus stop. Plaintiff was able to board the bus, but once on the bus, the lift failed to fully retract and the bus doors would not close. The bus driver informed the passengers that the lift was broken and that they could board the next bus, which they did. Eventually, the lift retracted and the bus transported plaintiff to work. Amended JPO, ¶ III.8–10.

Plaintiff complained to Tri–Met's Customer Service Department and, unsatisfied with the response, eventually brought this action in federal court. Amended JPO, ¶ III.11–13.

As relevant to the pending motion, plaintiff alleges that Tri–Met has violated Title II of the ADA and the implementing regulations by, among other things, failing to maintain the wheelchair lifts, failing to implement an effective system of regular or preventive maintenance, and failing to operate a sufficient number of "paratransit

cabs"[1] or to call for paratransit services for disabled passengers when needed. Plaintiff seeks injunctive relief, the details of which are discussed below, as well as compensatory damages.

### 3. Earlier Proceedings

This is the third round of motions. In the first round, Tri–Met moved, among other things, to dismiss Tom Walsh (Tri–Met's director) as a defendant, and to dismiss plaintiff's claims for compensatory and punitive damages on the ADA claim. I granted the motion to dismiss defendant Walsh and plaintiff's claim for punitive damages, but otherwise denied Tri–Met's motion.

In February 1999, Tri–Met moved for summary judgment on both plaintiff's ADA and negligence claims. With respect to the ADA claim, Tri–Met argued that the ADA does not prohibit isolated and temporary lift failures.[2] With respect to the negligence claim, Tri–Met argued that as a factual matter, plaintiff could not prove the elements of his claim. Finally, Tri–Met argued that plaintiff could not prove discriminatory intent, which is required for recovery of compensatory damages under Title II of the ADA under Ninth Circuit jurisprudence. See Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir.1998). Because plaintiff's evidence appeared sufficient to raise genuine issues of material fact as to all of his claims, I denied Tri–Met's motion in its entirety.

### THE PRESENT MOTION

In June 1999, the parties filed the amended JPO, which includes an equitable claim for injunctive relief under the ADA, a claim plaintiff mistakenly omitted from the original JPO. Tri–Met's motion for summary judgment primarily is directed against that claim. Tri–Met makes two basic arguments in support of its motion

against plaintiff's claim for injunctive relief. First, Tri–Met contends that plaintiff lacks standing to seek injunctive relief because he cannot show any risk of future harm. Second, Tri–Met argues that even if plaintiff were able to prove a violation of the ADA, plaintiff cannot demonstrate that he is entitled to injunctive relief.

Additionally, Tri–Met urges the court to reconsider plaintiff's entire ADA claim. The thrust of Tri–Met's argument is two-fold. First, Tri–Met contends that the record demonstrates that plaintiff cannot prove intentional discrimination, as required for recovery of compensatory damages. Second, Tri–Met contends that plaintiff has not attempted to and cannot prove a system-wide failure to provide accessible transportation, tested in comparison to system-wide operations overall. Instead, according to Tri–Met, plaintiff's evidence merely shows a few incidents of lift failure and an occasional bad employee (out of 1,200 plus employees).

### STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. United Steelworkers of America v. Phelps Dodge, 865 F.2d 1539, 1542 (9th Cir.1989).

---

1. Paratransit services are a form of special transportation service complementary to fixed route bus services. See 42 U.S.C. § 12143.

2. 49 C.F.R. § 37.161 establishes the requirements for maintenance and repair of public

transportation accessibility features, and also provides, at subsection (c), that "[t]his section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 49 C.F.R. § 37.161(c).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service*, 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## DISCUSSION

### 1. *Legal Framework*

Section 12132 of Title II, which generally prohibits discrimination against qualified individuals with disabilities, provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Part B of Title II describes certain actions by public entities in the area of public transportation that are considered discriminatory. *See* 42 U.S.C. § 12141 *et seq.* As pertinent to the present action, section 12142 of Title II deems it discriminatory for a public entity that operates a fixed route system to, among other things, purchase or lease a new bus if the bus is "not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12142. Similarly, section 12143 deems it discriminatory for a public entity that operates a fixed route system to fail to provide paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, at a level comparable to services provided to individuals without disabilities:

It shall be considered discrimination * * * for a public entity which operates a fixed route system * * * to fail to provide with respect to the operations of its fixed route system, * * * paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, that are sufficient to provide to such individuals a level of service (1) *which is comparable to the level of designated public transportation services provided to individuals without disabilities* using such system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.

42 U.S.C. § 12143(a)(emphasis added). In other words, the ADA does not require public transit agencies to provide *better* service to disabled passengers than is provided to other passengers, only *comparable* service.

### 2. *Plaintiff's Standing to Seek Injunctive Relief*

Tri–Met contends that plaintiff lacks standing to seek injunctive relief because he cannot demonstrate that he will suffer an injury in fact—*i.e.*, a " 'real and immediate threat' " of repeated future harm—if the injunction is not granted. *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329, 1333 (N.D.Cal.1994)(*quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

■ The standing requirement is a prerequisite for federal court jurisdiction growing out of the "case or controversy" requirement of Article III of the United States Constitution. *See City of Los Angeles*, 461 U.S. at 101, 103 S.Ct. 1660. The Supreme Court has developed a three-part test for standing. The first prong of the test, which is implicated by Tri–Met's motion,[3] requires that "the plaintiff have suf-

---

**3.** The second and third prongs, causation and redressability, are not at issue in the present motion. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

fered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)(*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

*City of Los Angeles* established that a plaintiff seeking injunctive relief premised on an alleged past wrong must show more than "abstract injury." *City of Los Angeles,* 461 U.S. at 101, 103 S.Ct. 1660. Instead, plaintiff must demonstrate a "real and immediate threat" of future harm, a requirement that is independent of the substantive requirements for equitable relief. *City of Los Angeles,* 461 U.S. at 105, 111, 103 S.Ct. 1660; *see also Aikins,* 843 F.Supp. at 1333.

▐ Tri–Met rests its argument that plaintiff cannot demonstrate a real and immediate threat of future harm on evidence of Tri–Met's extensive ongoing operator training programs, maintenance and inspection efforts, policies and procedures for addressing the ADA requirements and the needs of its disabled passengers, public outreach efforts, and equipment upgrades. Tri–Met's evidence also shows that the hydraulic fluid problem, which caused lift failures on the "Flxible" buses during the extremely cold weather in January 1996, was addressed and fully resolved by the Fall of 1997. Affidavit of Bradley Tellam (December 15, 1998), Exhibit 2, pp. 7–8.

Plaintiff's evidence, in turn, shows that he routinely relies on bus service for travel to and from work. He testified by affidavit that, in addition to the initial incident in 1996 and the incidents outlined in his affidavit of February 1999, on June 2 and September 29, 1999, he again experienced

bus lift failures. In one of the episodes, the safety railing caught his feet, pulling him out of his chair onto the sidewalk. *See* Declaration of Joseph Midgett (October 4, 1999), ¶ 4. Plaintiff also has submitted affidavits of several other disabled Tri–Met riders who similarly complain of instances of lift failure and malfunction, missing or broken securement devices, and operator inexperience or incompetence, some of which occurred in 1999.[4] That evidence suggests at least a reasonable likelihood that plaintiff could suffer harm from lift malfunction in the future, should Tri–Met's allegedly wrongful conduct continue. Consequently, I conclude that plaintiff has established standing.

### 3. Merits of Claim for Injunctive Relief

#### a. Standard

▐ Assuming that plaintiff could establish that the lift failures of which he complains constitute ADA violations, the court must balance three factors in determining whether plaintiff is entitled to injunctive relief: (1) the threat of irreparable harm to him; (2) the harm to Tri–Met should the injunction be granted; and (3) the public interest at stake. *See, e.g., Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

▐ Moreover, because Tri–Met is a state public entity, plaintiff's request for injunctive relief must be weighed against concerns of equity, federalism, and comity. In *Thomas v. County of Los Angeles,* 978 F.2d 504 (9th Cir.1992), the Ninth Circuit cautioned that a strong factual record, showing an intentional and pervasive pattern of misconduct, is necessary to support an injunction against a state, as opposed to

4. In a footnote to its reply memorandum, Tri–Met moves to strike the testimony of the other witnesses on the ground that "it contains conclusions not within their personal knowledge and is filled with hearsay." Reply Memorandum, p. 2 n. 1. In support of the motion to strike, Tri–Met invites the court to dig through earlier filed pleadings, but as numer-

ous courts have observed: "Judges are not ferrets!" *See, e.g., Nicholas Acoustics & Specialty Co. v. H & M Const. Co., Inc.,* 695 F.2d 839, 846 (5th Cir.1983). In any event, I have not relied on the inadmissible portions of the witnesses' testimony in making my decision, and Tri–Met's motion to strike is therefore moot.

a federal, agency. *Thomas*, 978 F.2d at 508 (*citing Rizzo v. Goode*, 423 U.S. 362, 375, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). Tri–Met, although not a state "agency" per se, is a state entity. *See Griffin By and Through Stanley v. Tri–County Metropolitan Transp.*, 318 Or. 500, 503, 870 P.2d 808 (1994)(Oregon Tort Claims Act applies to Tri–Met).

### b. *Plaintiff's Proposed Injunction*

In his claim for injunctive relief, as outlined in the amended JPO, plaintiff asks the court to order Tri–Met to undertake a laundry list of augmented practices, including implementation of the following:

1. Augmented statistical practices, specifically, collecting and reporting of data concerning wheelchair lift failures, including certain specific requirements such as daily operator logs, disciplinary measures, and weekly web site postings of wheelchair boardings and lift failures;

2. Objective and measurable benchmark data for assessing improvement in lift service, developed in consultation with plaintiff's counsel; [5]

3. Augmented "attitudinal" training regarding disabled passengers and functional training concerning lift operation and procedures;

4. More effective communications, including strict requirements for reporting of lift failures and disciplinary procedures for failure to report;

5. A media outreach program, developed in consultation with plaintiff's counsel, to increase awareness of the availability of lift access and the complaint and reporting procedures for lift failures;

6. An effective backup system to use in "unusually cold weather" to ensure against system failure;

7. A dedicated customer service line for customers of fixed route lift service with procedures and "measured compliance" requiring acknowledgment of complaints within 24 hours. Criteria for compliance to be developed in consultation with plaintiff's counsel; and

8. Revised scheduling procedures to allow sufficient time for inspections, including time for cycling of the lift, before every shift.

In addition, plaintiff asks the court to order Tri–Met to develop, in consultation with plaintiff's counsel, "means, methods and criteria" for measuring compliance and progress under the proposed injunction for a period of five years. *See* Amended JPO, pp. 7–10.

### c. *Tri–Met's Argument*

Tri–Met argues that plaintiff is not entitled to the above injunctive relief because—under Tri–Met's current (and highly regulated) operations—there is no threat of irreparable future harm. Tri–Met characterizes plaintiff's request for injunctive relief as an attempt to invoke federal powers to take control of a state entity's operation of a highly integrated and regulated transportation system, all to remedy a few sporadic or isolated problems.

Tri–Met also contends that plaintiff's proposed injunction ignores the potential unintended consequences on other passengers, disabled and non-disabled alike. Federal law, through regulations of the Department of Transportation, also imposes limits on Tri–Met which, Tri–Met contends, plaintiff ignores. As one example, plaintiff asks for an augmented back up system, but only a certain percentage of a transit district's buses may be out of service at any time, and there are limits on the number of back up buses a transit district may own. *See* Federal Transit

---

5. Plaintiff also asks the court to require Tri–Met to compensate his counsel, on an hourly basis, for time incurred in consulting, monitoring, measuring, or otherwise participating in ensuring that Tri–Met complies with the terms of the proposed injunction, for a period of five years.

Administration circular FTA C 9030.IC (attached to Tri–Met's Reply).

Tri–Met explains, and plaintiff does not dispute, that it provides 70 million rides covering approximately 300 million miles per year (approximately 223,000 boardings per day). Tri–Met must provide service to outlying areas in all weather, and must maintain a fleet in excess of 600 buses. Tri–Met must keep fares low, plan for growth, train and manage its public employees, and adapt quickly to changes such as bad weather, bomb threats, construction, presidential visits, and police detours. In doing so, Tri–Met must consider disabled passengers (of all kinds, not just mobility-impaired), as well as the young, the elderly, and the ordinary passengers.

Tri–Met supports its challenge to plaintiff's claim for an injunction on a factual comparison between the relief plaintiff requests and what Tri–Met already does. Tri–Met has submitted extensive evidence concerning the numerous policies, systems, and procedures already in place to ensure equal access. Without attempting to summarize all of the details, those systems include:

1. *Bus Dispatch System* ("BDS"). The BDS system is a satellite system that provides radio and computer-based communications between operators and dispatch, passes along information concerning lift use, and can locate buses within 30 feet. BDS contains multiple levels of communication capability, reporting lift use and allowing direct communication by operators with Tri–Met in the event of a lift failure. Declaration of Clyde Earl, ¶ 5.

2. *Dedicated Customer Line.* Customer calls are documented on customer information forms. Complaints relating to lift failures or other ADA issues usually are marked "Urgent" and routed through the legal department as necessary. Declaration of Ed Rosney, ¶ 3.

3. *Committee on Accessible Transportation* ("CAT"), formed in 1985 to review accessibility issues. Seven of the 15 members are persons with disabilities. CAT's role is to advise the Tri–Met Board of Directors and staff. CAT was instrumental in Tri–Met's decision to purchase low floor technology and in other ADA-related policy decisions affecting all riders with disabilities. *See generally* Declaration of Debra Maercklein.

4. *Website,* which contains information on the ADA, the CAT committee, Tri–Met's accessibility service, and a lift rider's guide. The website also contains phone numbers where riders with disabilities can obtain more information. Declaration of Ed Rosney, ¶ 2.

5. *Brochures* and "channel cards" offer written and visual information on lift programs, Tri–Met's responsibilities under the ADA, and other issues. The brochures and channel cards are placed on the buses. Declaration of Ed Rosney, ¶ 4.

6. *Training programs.* Tri–Met has over 2,400 employees, of which approximately 1,300 operate buses. To meet its accessibility goals, Tri–Met first placed accessible buses in service in the 1980's and began training new employees in accessibility at that time. The details of Tri–Met's training program are described in the Declaration of Adrian Moy, and will not be recited here. To summarize, however, the training programs, which have been revised over time, contain many ADA-related components, including a formal ADA orientation, classroom and on-the-job instruction in lift operation and securement, practical training on every type of bus in the fleet, sensitivity training and what plaintiff refers to as "attitudinal" training.

7. *Operations.* To ensure that training is implemented, Tri–Met contracts with a quality assurance program in which an outside investigator rides a bus to observe the operator's behavior. Tri–Met also has a supervisor ride-a-long program. A Defensive Driving Evaluation reflecting the supervisor's feedback is then placed into the computer system for use by the Station Manager. Declaration of Clyde Earl, ¶ 3. Additionally, Tri–Met has installed cameras on 213 buses (which help monitor

operator performance), and plans to install more. Declaration of Clyde Earl, ¶ 4.

The BDS system, discussed above, also helps ensure ADA compliance by providing computerized tracking and locating of buses. All operators are trained in the BDS system.

8. *Discipline.* Tri–Met points out that its employees are subject to a collective bargaining agreement. Consequently, Tri–Met cannot unilaterally impose new disciplinary measures, nor can it place confidential discipline information on the public website, as plaintiff requests.

9. *Maintenance.* Tri–Met spent $32 million (21 percent) of its $155 million fiscal year 1999 budget on maintenance. The general program includes basic inspections every 1,500 to 3,000 miles (every two to three weeks), and comprehensive inspections at 6,000 mile intervals. Lift service is monitored on a regular basis per manufacturer specifications and the lifts are cycled in pre-trip inspections or at night. Declaration of Anton Bryant, ¶¶ 2–3. At least as of October 1998, the maintenance department began using a new hydraulic fluid that "is better able to withstand cold temperatures." Declaration of Adrian Moy, Exhibit 3, p. 46.

10. *ADA–Related Policies.* Tri–Met has extensive policies concerning ADA issues. With respect to lift passengers and lift malfunctions,[6] Tri–Met's policy requires, among other things, that the operator (1) stop and explain the situation and record the passenger's name; (2) before leaving the stop, notify the dispatcher that a passenger with a disability cannot board; and (3) ask the customer whether he or she can transfer to a cab and/or wait up to 30 minutes for a ride. Declaration of Adrian Moy, Exhibit 3, p. 45 (Riding Together training manual). The training manual further instructs, in bold: "**Do not leave until you have communicated with the dispatcher and arrangements for transportation have been made.**" *Id.*

Tri–Met emphasizes that neither the ADA nor the implementing regulation require perfection. Indeed, the regulations that address maintenance of vehicle lifts expressly contemplate that lifts, at times, will be inoperable. For example, 49 C.F.R. § 37.163 provides, in relevant part, that

> (b) The entity shall establish a system of regular and frequent maintenance checks of lifts sufficient to determine if they are operative.
>
> (c) The entity shall ensure that vehicle operators report to the entity, by the most immediate means available, any failure of a lift to operate in service.
>
> (d) Except as provided in paragraph (e) of this section, when a lift is discovered to be inoperative, the entity shall take the vehicle out of service before the beginning of the vehicle's next service day and ensure that the lift is repaired before the vehicle returns to service.
>
> (e) If there is no spare vehicle available to take the place of a vehicle with an inoperable lift, such that taking the vehicle out of service will reduce the transportation service the entity is able to provide, the *public entity may keep the vehicle in service with an inoperable lift for no more than * * * three days (if the entity serves an area of over 50,000 population) from the day on which the lift is discovered to be inoperative.*
>
> (f) In any case in which a vehicle is operating on a fixed route with an inoperative lift, and the headway to the next accessible vehicle on the route exceeds 30 minutes, the entity shall promptly provide alternative transportation to individuals with disabilities who are unable to use the vehicle because its lift does not work.

(Emphasis added.)

Finally, Tri–Met points out that the Federal Transit Administration, in its

---

**6.** The regulations and Tri–Met's policies mandate that disabled riders who do not use wheelchairs be permitted to use the lifts. 49 U.S.C. § 37.165(g); *see, e.g.,* Declaration of Adrian Moy, Exhibit 3, p. 89.

draft report of the fiscal year 1999 trienni-al review, found Tri–Met "in compliance with the ADA requirements." Declaration of Bruce Harder, Exhibit 1, p. 9.

### d. *Plaintiff's Response*

Plaintiff concedes that he cannot contro-vert Tri–Met's evidence, but argues that notwithstanding Tri–Met's comprehensive policies and procedures, Tri–Met mobility-impaired riders still experience difficulties in obtaining equal access. In support of this argument, plaintiff has submitted his own and other riders' affidavits, which de-scribe incidents of lift failures, improper securement, operator carelessness or indif-ference, and customer service apathy. These incidents include:

1. *Plaintiff.* On June 2, 1999, the lift safety rail went down unexpectedly, allow-ing plaintiff's wheelchair to fall backwards off the lift. That same evening, a safety rail caught plaintiff's feet, pulling him to the sidewalk. On September 29, 1999, plaintiff was required to wait for a second bus because the first bus's lift was inopera-ble. Plaintiff also notes that comment forms are too high or missing on the bus-es. Declaration of Joseph Midgett, ¶¶ 2–5, 6.

2. *Dianna Spielman.* Spielman testi-fies that on July 18, 1999, the securement latch would not close, and the driver did nothing to correct the problem. Declara-tion of Dianna Spielman, ¶¶ 3–4.

3. *Ric Burger.* According to Burger, on August 5, 1999, an operator was unwill-ing to secure his chair. On August 25, 1999, a low floor bus was traveling too fast to stop properly. Consequently, the ramp was too steep for the wheelchair. On August 27, 1999, the operator failed to properly deploy the ramp. Burger also complains that a driver allowed other pas-sengers on first, that he has observed no accountability in response to his com-plaints, and that although he is on a list for the class "Riding Together," he never receives notice of class schedules. Decla-ration of Ric Burger, ¶¶ 3–9.

4. *Patrick Rigert.* Rigert estimates that lift malfunctions prevent him from boarding approximately 10 times per year, or five percent of his attempted boardings. Rigert states that customer service calls accomplish nothing. Rigert also describes an occurrence, in late 1998, in which he was trapped on a lift for 45 minutes. Dec-laration of Patrick Rigert, ¶¶ 3–6.

5. *Robert Pung, Sr..* Pung states that he experienced lift problems "in excess of a dozen instances in 1998," including one incident in which the lift "smash[ed] his legs," bruising them. Pung states that he has been left several times at bus stops due to various problems with lifts. Decla-ration of Robert Pung, Sr., ¶¶ 6–10.

6. *Richard McQuirk.* McQuirk states that he has seen improvements in Tri–Met's lift service, but still experiences dif-ficulties, particularly on the older buses. McQuirk also states that approximately one in 20 bus drivers fails to properly secure his wheelchair. Declaration of Richard McQuirk, ¶¶ 3–5.

With respect to the above evidence, Tri–Met points out that none of the wit-nesses, including plaintiff, has testified that he or she ultimately *did not* obtain public transportation to the original desti-nation. Based on that premise, Tri–Met contends that the harm, if any, is not "irreparable" in the sense required for in-junctive relief.

Perhaps because he cannot controvert Tri–Met's evidence, in his response to Tri–Met's motion plaintiff has retreated sub-stantially from his initial and detailed re-quest for injunctive relief, and now sug-gests a more limited injunction. Plaintiff states:

The essence of plaintiff's request for injunctive relief is to obtain an order from the Court requiring defendant to insure that its operators and customer service personnel follow policies and procedures, and receive appropriate dis-cipline if they violate those policies. Plaintiff also seeks a commitment from

Tri–Met to improve its customer service to the disabled passengers by providing timely responses to complaints and equal access to information. * * * To the extent that Tri–Met's current policies and procedures are not making these things happen, they are inadequate and the Court should order Tri–Met to make reasonable modifications to its policies, procedures and training to ensure their success.

Plaintiff's Response, p. 7. Alternatively, plaintiff suggests that

> Even if this Court finds that the policies, procedures and training in place within the Tri–Met system as of October, 1999 adequately address the ADA and its requirements, a permanent injunction requiring Tri–Met to effectuate its policies, procedures, and training would be appropriate.

*Id.*

e. *Analysis*

 From the outset of this litigation, it has always appeared to the court that plaintiff's principle purpose in commencing this action was to compel Tri–Met's compliance with the ADA, and specifically to obtain assurance that the cold weather lift failures experienced in January 1996 never again occurred. The evidentiary record now before the court demonstrates that the desired corrective action has already been taken. While plaintiff points to occasional lift problems he and other wheelchair passengers have encountered, when viewed in the larger context of Tri–Met's entire fixed route system and the diverse passengers, including diverse disabled passengers, that it serves, I am compelled to conclude that the ongoing occasional lift problems do not violate the ADA or its implementing regulations and that, under existing circumstances, it would be improper for this court to use its power to enjoin Tri–Met.

Additionally, plaintiff has not met his burden of demonstrating a threat of *irreparable* future harm. Although plaintiff has raised an inference that he might, in the future, again experience delay in getting to his destination, the record plainly demonstrates every time plaintiff has chosen to use Tri–Met, he ultimately has been transported to his destination. In view of that undisputed fact, and balancing that fact against the public's interest generally and Tri–Met's interests specifically, I find that injunctive relief in this case is unwarranted.

4. *Claim for Compensatory Damages*

 In *Ferguson v. City of Phoenix,* 157 F.3d 668 (9th Cir.1998), the Ninth Circuit expressly held that compensatory damages are not available under Title II of the ADA absent a showing of discriminatory intent or, at a minimum, deliberate indifference. *Ferguson,* 157 F.3d at 674–75 (holding that discriminatory intent must be shown, but declining, on the record before it, to determine whether "discriminatory animus" or "deliberate indifference" is the proper standard). The *Ferguson* court clarified that, under either test, "bureaucratic inertia as well as some lack of knowledge and understanding" do not satisfy the intent requirement. *Ferguson,* 157 F.3d at 675.

In this case, plaintiff has presented no evidence from which a rational inference of discriminatory intent can be drawn. *See T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 631 (9th Cir.1987)(assuming existence of underlying facts, an inference as to another material fact "may be drawn in favor of the non-moving party only if it is 'rational' or 'reasonable' " (citation omitted)). Consequently, summary judgment on his claim for compensatory damages under the ADA is appropriate.

5. *Plaintiff's Negligence Claim*

 Federal jurisdiction in this case rests on plaintiff's ADA claim. 28 U.S.C. § 1331. Because summary judgment as to plaintiff's ADA claims is granted, I decline to retain jurisdiction over plaintiff's supplemental state law negligence claim. Ac-

cordingly, that claim is dismissed without prejudice.

### 6. Costs

 Because Tri–Met is the prevailing party, I anticipate that Tri–Met will seek an award of costs, which will be denied. Despite the final outcome of this litigation, in my view plaintiff has achieved, through his complaints to Tri–Met, his commencement of this action, and the pursuit of his claims, valuable and beneficial improvements in Tri–Met's fixed route bus system, particularly in the areas of accessibility, training, equipment, and awareness. Because plaintiff's lawsuit ultimately benefitted both the disabled and non-disabled members of the community Tri–Met serves, I cannot, in good faith, allow an award of costs against plaintiff.

### CONCLUSION

Tri–Met's motion for summary judgment (# 81) is GRANTED as to plaintiff's ADA claims. Plaintiff's supplemental state law negligence claim is DISMISSED without prejudice. No costs will be awarded to either party, and any other pending motions are denied as moot.