Vincent **MARTIN**, et al., on behalf of themselves and all other disabled persons similarly situated, Plaintiffs,

v.

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY**, et al., Defendants.

Civil Action File No. 1:01–CV–3255–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 7, 2002.

Georgia Kay Lord, Office of Georgia Kay Lord, Decatur, GA, Joshua H. Norris,

Office of Joshua H. Norris, Atlanta, GA, Henry Timothy Willis, Disability Law and Policy Center, Tucker, GA, for Plaintiffs.

John Roger Lowery, Karen Margaret Vaughan, Pursley Lowery & Meeks, Atlanta, GA, for Defendants.

## ORDER

THRASH, District Judge.

This is an action in which the Plaintiffs seek injunctive and declaratory relief against the Metropolitan Atlanta Rapid Transit Authority ("MARTA") pursuant to the Americans With Disabilities Act. It is before the Court on the Plaintiffs' Motion for a Preliminary Injunction [Doc. 15] and Amended Motion [Doc. 25]. For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' motion with respect to liability.

## I. BACKGROUND

Plaintiffs have brought this action for injunctive and declaratory relief on behalf of themselves and all other similarly situated individuals with disabilities alleging that there is a system-wide pattern and practice of discrimination against people with disabilities by Defendants. Plaintiffs' claims are brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act").

Plaintiffs allege that they have suffered and continue to suffer immediate and irreparable injury due to MARTA's continuous violations of both the ADA and the Rehabilitation Act in the operations of its mass transit system. Plaintiffs have profound physical impairments. Plaintiffs Martin, Thomas and Reynolds are blind or visually impaired. Plaintiff Baker has cerebral palsy and requires a wheelchair for mobility. Plaintiffs Davis and Hasan Amin are quadraplegics and require wheelchairs for mobility. The Plaintiffs contend that they are dependent upon MARTA to provide them with their daily transportation needs.

This action was filed on November 28, 2001. The parties engaged in some discovery. There were some discussions between counsel regarding settlement. These discussions were unsuccessful in resolving the case. The Plaintiffs filed the Motion for a Preliminary Injunction [Doc. 15] on March 28, 2002. At a scheduling conference on April 2, 2002, the Plaintiffs withdrew their Motion to Certify a Class. A hearing on the Motion for A Preliminary Injunction was scheduled for June 3, 2002. The parties were allowed to present testimony by affidavit provided that the affiant was available for cross-examination upon request by the opposing party. At the June 3 hearing, the Court heard opening statements from counsel. The Plaintiffs called four witnesses for direct examination and one MARTA employee for cross-examination. The Defendants rested upon their affidavit testimony. At the conclusion of the hearing, the Court became aware that the Federal Transit Administration was about to issue a report concerning an audit of MARTA's compliance with the ADA. The Court postponed the scheduled oral argument on the motion until the report could be made part of the record. The report was filed with the Court on June 21, 2002. The Court then received additional briefs and heard oral argument on the motion on August 5, 2002. Neither side raised significant credibility challenges to the testimony presented by the other. Therefore, unless otherwise noted, all testimony referenced in this Order is accepted as credible and worthy of belief.

### A. *Availability of Information in Alternative Formats*

Plaintiffs allege that MARTA's failure to provide them with scheduling and route

information in accessible formats violates the ADA. MARTA provides schedule and route information to disabled customers through an information telephone number that a disabled customer can call and get information on a specific route. MARTA contends that schedules are available in Braille, if requested through customer service, although it may take several weeks for the customer to receive the schedule.

At the evidentiary hearing Plaintiff Brent Reynolds testified that "his major problem with MARTA has always been access to information, the accessibility of schedule and timetable information, especially for the buses...." (Transcript of Evidentiary Hearing of June 3, 2002, at 95.) Mr. Reynolds testified that he has requested information from MARTA in Braille, but never received it. On one occasion he was told that customer service did not handle those requests. (Transcript at 104.) When he finally found someone at MARTA to assist him, he was told that information in Braille would only be provided if he identified a specific date of a trip, the time he wanted to depart a certain point and the point at which he wanted to end the trip. (Transcript at 117.) Since he was unable to obtain the schedule information in Braille that he wanted, Mr. Reynolds then requested stop announcement information to be sent to him in text files so that he could use his computer to translate it himself. Instead of what he requested, Mr. Reynolds testified that he was sent a "turn list" by MARTA, which is basically the driving route provided to drivers. This was not what Mr. Reynolds had requested, nor was it helpful to him. (Transcript at 112.)

Mr. Reynolds also testified as to the telephone service provided by MARTA. Information is available by telephone, Mr. Reynolds said, if it is a specific request such as "what time does [sic] the next three number 25 Peachtree Industrial bus-es leave the Peachtree Industrial station." (Transcript at 117.) If it is a more complicated request, for example, if he needed to find out how to get to a place that requires him to go from one bus to one or more trains and then to one or more buses toward outlying areas, he said that very frequently he receives incorrect information from the customer service people. (Transcript at 117.) Finally, he stated that he is often on hold for a lengthy period of time, anywhere from 30 seconds to 30 minutes. (Transcript at 118.)

Defendants argue that the telephone schedule and route information is the same information provided to any MARTA customer, whether disabled or not. (Transcript at 117.) However, Mr. Reynolds responded that although it is the same service, the difference is that he cannot get information on an entire route with the timetable so that he could independently plan a spur of the moment trip. He can only request very specific information. (Transcript at 117.)

Three other Plaintiffs' witnesses also stated they have never received information from MARTA in accessible formats, although they do not reveal when they made such a request or from whom. (Booth Aff. ¶ 8; Coon Aff. ¶ 14; Huggins Aff. ¶ 10; Martin Dep. at 11.) Mr. Roger Dottin, who is employed by MARTA, in their Office of Government and Community Relations, testified that MARTA makes information packets available in Braille at several public libraries, but only when MARTA is having a public seminar, public meeting or community meeting. (Transcript at 85–6.) The information packets do not contain schedule or route information. (Transcript at 86.) Mr. Dottin also testified that if a customer called and requested an entire route or schedule in Braille they could receive it. (Transcript at 88.)

Mr. Andy Greider is employed by MARTA as its Web Developer. MARTA's web site (*http://www.ITSMARTA.com*) provides the general public with extensive information on the routes and schedules for its fixed route services. It is not yet formatted in such a way that it is uniformly accessible to persons who are blind. (Greider Aff. ¶ 6.) Since June, 2002, Mr. Greider has been working to make MARTA's web site more accessible to the disabled. (Greider Aff. ¶ 5.) MARTA is in the process of developing a plan to modify its web site so that route and scheduling information can be displayed in an alternative, plain text format that is easily deciphered by text reader software. (Greider Aff. ¶ 7.)

### B. *Wheelchair Access on Buses*

Approximately 40% of MARTA's buses are 1990 model buses that have wheelchair lifts. These lifts use a hydraulic, electronic and mechanical system that is hard to maintain and is easily damaged. If the system does not operate, the lift cannot be operated manually. (Mirsajedin Aff. ¶ 6.) The newer buses use a ramp system which is easier to maintain. The ramp system can be operated manually. (Mirsajedin Aff. ¶ 11.) Plaintiffs allege that riders who need to use the ramps and lifts on fixed route buses frequently encounter a failure of accommodation, leaving them stuck on the curb for extended periods of time. Ms. Sheryl Grossman, who suffers from Blooms syndrome which is a developmental disability manifesting itself in short stature, testified that she often has a problem getting on and off the buses. Ms. Grossman needs the use of the lift to get on and off the bus because of her height and arthritis. She testified that when she makes a request to use the lift to board the bus, the drivers often question her as to why she needs it because she is not in a wheelchair. (Transcript at 27.) She also testified that she has been left by drivers who refuse to lower the lift. (Transcript at 28.) In addition, Ms. Grossman testified that frequently she has to wait at the bus stop for 30 minutes or more because lifts on the buses are not working and, therefore, she has to wait for one with a working lift. (Transcript at 29.) Ms. Grossman also maintains that customer service has been completely unresponsive to her. (Transcript at 28.) She has called many times to both complain and praise drivers. Frequently, when she calls customer service she either gets a recording to leave her name and someone will get back to her or she is put on hold. She can be on hold for anywhere from a few minutes to a very long time. (Transcript at 30.) Sometimes the customer service line says that they will investigate her complaints, but she is never again notified. (Transcript at 35.) On one occasion a customer service representative sent her a couple of free fare cards. (Transcript at 36.)

Several other witnesses testified that they have experienced "numerous," "many," or "several" instances of inoperable wheelchair lifts. (Gainer Aff. ¶¶ 7–8; Hawes Aff. ¶¶ 5–6; Nash Aff. ¶ 7; Roscoe Aff. ¶ 4.) These same witnesses state that they often have to wait extended periods of time for another accessible bus and are never provided with alternative transportation. (*Id.*) Mr. Bernard Baker testified that he has documented several encounters with inoperable lifts on MARTA buses since September, 2001. (Baker Dep. at 31–32.) Although he mentions three specific occasions before September 2001 in which he has to wait 30 minutes for accessible transportation, he also admits that there were another ten occasions when his wait was less than 30 minutes. (*Id.* at 51.) He also conceded that he has not had to wait for more than 30 minutes since September 2001. (*Id.* at 51–52.)

Defendants argue that they have submitted extensive evidence of the policies and procedures MARTA follows to ensure ADA compliance with regard to its fixed-route buses. Defendants claim that the operators are supposed to cycle the lifts during the five to ten minute bus check conducted just before they begin their run. (Mayfield Dep. at 97–99.) Defendants state that if a bus is found to operate improperly, it is removed from service. However, Plaintiffs assert that lift problems are continuing to occur frequently and that MARTA has inadequate systems in place to prevent them. For instance, Plaintiffs assert that although lift operators are responsible for cycling, they are often not monitored. Further, Plaintiffs argue that improperly operating buses are not removed from service. In fact several MARTA officials testified that buses with broken lifts could remain in service for up to three days. (Mirsajedin Dep. at 37, 42–43, 66, 70; Magee Dep. at 29–30.) This is true only if there are no lift equipped buses available as a substitute. 49 C.F.R. § 37.163(e).

In addition, Plaintiffs assert that MARTA does not have an effective system of alternative transportation in place when lifts fail during a run. Plaintiffs presented evidence of many occasions when stranded lift users saw no indication that such systems existed. (Gainer Aff. ¶ 7; Grossman Aff. ¶ 7; Hawes Aff. ¶ 6; Nash Aff. ¶ 7; Roscoe Aff. ¶ 4.) Further, Plaintiffs point out that MARTA's own procedures on this point are internally contradictory. One MARTA official avers that when a lift fails during a run, the operator is to call a supervisor to the scene to confirm that the lift is broken. (King Aff. ¶¶ 5, 6.) This testimony is contradicted by a memorandum dated July 17, 2000, which states that the bus driver is to call Radio Communications to request the dispatch of a lift equipped bus to the location of the disabled patron. (Magee Aff., Ex. 3.) MAR-

TA's Superintendent of Bus Operations testified that he was not familiar with the ADA requirements regarding lifts and alternative transportation. (Magee Dep. at 29–30.) MARTA's Manual of Instruction, Operating Rules and Discipline Code for the Bus Transportation Divisions, commonly known as the "Red Book," does not contain any reference to the alleged procedures for pre-trip cycling of lifts or the procedure to follow if a lift is discovered to be inoperable during service. (Magee Aff., Ex. 1.)

Finally, Plaintiffs contend that there is inoperative wheelchair securement on fixed-route buses. Plaintiff Hasan Amin stated that more of the buses she rides have belts that don't work than belts that do work. (Hasan–Amin Dep. at 54.) Another witness, Roger Lee, testifies that he is "often" secured improperly, either because the belts are broken or the driver does not know how to secure him with the belt. (Lee Aff. ¶ 6.) Defendants argue that these are only two accounts to what are probably only a few incidents and are simply not enough to warrant a preliminary injunction.

## C. ADA Stop Announcements

Plaintiffs allege in their motion that MARTA bus and rail operators are failing to make announcements that are required under the ADA. Plaintiff Reynolds testified that he consistently has problems with drivers not announcing the required information. (Transcript at 101.) It is critical for a blind person to know where they are in the route so that they can get off the bus at the proper stop. Frequently, Mr. Reynolds maintains that he often ends up missing his stop and having to get off the bus a few stops later which can be very dangerous because it is unfamiliar. (Transcript at 102.) Frustrated with customer service, Plaintiff Reynolds testified that in

August 2001 he began keeping track of when stops were and were not announced. In his records he kept track of where and when he got on the bus and where and when he got off. In most cases, when he could get the information, he also recorded the route number and bus numbers. (Transcript at 120.) In total, Plaintiff Reynolds recorded 136 trips that he took between August 2001 and May 2002. According to his records, stops were not announced on approximately 82 trips. (Transcript, Plaintiff's Ex. 1.) In addition, there were several other trips where the intercom was not working properly or the announcements were inaudible. (*Id.*)

Ms. Grossman also testified to the failure of drivers to make stop announcements. Ms. Grossman stated that she always asks the driver to make stop announcements when she boards the bus. (Transcript at 31.) She says that on most occasions it has been very difficult for her to get stop announcements called. (Transcript at 33.) She also maintains that in a recent ride no announcements were made and, because of this, she didn't realize for 20 minutes that she was on the incorrect bus. (Transcript at 32.)

Further Plaintiffs' witnesses, such as Leonard Ellis, stated that he "witness[es] numerous violations" on certain bus routes and that "most" train operators fail to announce stops. (Ellis Aff. ¶ 6.) Likewise, Virginia Gray testified that bus drivers "regularly fail to announce stops and transfer points," but does not say exactly how often is "regular." (Gray Aff. ¶ 8.) Plaintiff Vincent Martin states in his affidavit that bus drivers do not announce stops, but testifies in his deposition about only one incident in 1995 when he was not informed of his stop. (Martin Aff. ¶ 7; Martin Dep. at 13–14.) Kisiah Timmons alleges that she has had many problems on the buses. (Timmons Aff. ¶ 10.) Plaintiff

Stephanie Davis complains that the train announcements are not consistent in that they are sometimes made by operator and other times by automatic recording. (Davis Dep. at 25.) Plaintiffs and others have made repeated complaints about the failure of bus and rail operators to make stop announcements. (Booth Aff. ¶ 6; Ellis Aff. ¶ 9; Grossman Aff. ¶ 12; Reynolds Aff. ¶ 10.) MARTA's rail operations officials require that in order to make a complaint the patron must provide the number of the rail car and the badge number of the operator before investigating. (Beauford Aff. ¶ 13.) Plaintiffs argue that simply filing a complaint is extremely difficult for visually impaired riders.

Defendants argue that the evidence presented by Plaintiffs is not indicative of a continuing, widespread problem. Walter Morris, for example, testified that he has been using MARTA for most of his transportation needs for more than ten years and he can only cite a total of five instances since July 2001 when a MARTA operator failed to make a required announcement. (Morris Aff. ¶¶ 4–5.) Paul Booth, a regular rider of MARTA for several years, only recalls nine instances when rail operators failed to make announcements. (Booth Aff. ¶¶ 3,5.) There are no references to the necessity for making ADA stop announcements in the Red Book. (Magee Aff., Ex. 1.) This is not surprising since the Red Book has not been revised since 1987, three years prior to passage of the ADA.

Mr. Franklin Beauford is MARTA's Director of Rail Transportation. In his affidavit, he testified that MARTA trains are equipped with an Automatic Train Announcement System ("ATAS"). ATAS has become increasingly difficult to repair and maintain because it contains components that are obsolete and no longer manufactured. As a result problems with ATAS

are not always readily repairable. (Patterson Aff. ¶ 6.) A few years ago, as a result of complaints from MARTA employees and customers, Mr. Beauford became aware of problems with the reliability of the ATAS. (Beauford Aff. ¶ 10.) In January, 2002, Mr. Beauford issued a general order requiring rail operators to make station announcements regardless of whether the ATAS was also making the announcement. (Beauford Aff. ¶ 11.) MARTA also operates a "Mystery Rider" program. He receives quarterly reports from this program. (Beauford Aff. ¶ 15.) None of the reports were introduced into the record. MARTA plans to begin an overhaul of its railcar communications systems in November, 2002. The process will not be complete until the end of 2008. (McDonald Aff. ¶ 11.)

### D. *Training*

Plaintiffs argue that MARTA's current training programs for its bus, rail and paratransit operators is not sufficient to meet ADA requirements. Plaintiffs presented four witnesses with specific complaints about MARTA bus operators. Mr. Roger Lee complains that bus drivers do not know how to secure his wheelchair properly, but describes only one specific incident in January, 2001. (Lee Aff. ¶ 7.) Ms. Virginia Gray cites one instance in which she overheard a bus driver say: "Here comes the blind lady" before he drove away and left her at a bus stop. (Gray Aff. ¶ 12.) Ms. Grossman complains that several drivers have failed to call her stop or questioned her need to use the wheelchair lift or ramp. (Grossman Aff. ¶¶ 7–8.) Plaintiff Hasan Amin states that one bus driver that she encountered two months ago did not know how to manually lower a wheelchair ramp. (Hasan Amin Dep. at 49.)

Until February, 2002, MARTA provided bus and rail operators ADA training only at the time that they were hired. (May-field Dep. at 132.) MARTA presented evidence as to its current training policies and procedures. This included training manuals and materials from training programs. These materials are relevant to some of the issues raised by Plaintiffs. For example, the Operator Candidate's Manual does contain appropriate instructions regarding making ADA stop announcements. (Mayfield Aff., Ex. 1, at 69.) The manual states that malfunctioning lifts are to be reported to the Communications Center. (*Id.*) In February, 2002, MARTA began a four hour refresher ADA training program for bus operators in Customer Service and the ADA. (Mayfield Aff. ¶ 17, 18.) It is re-certifying 12 to 16 operators per week. The entire fleet will not be re-certified before the end of 2002. (Mayfield Aff. ¶ 18.) MARTA requires paratransit operators to be re-certified in customer service and the ADA every two years. (Mayfield Aff. ¶ 24.) It is not clear when this re-certification program was initiated. The training materials are dated April 26, 2002. (Mayfield Aff., Ex. 14.) However, Plaintiffs assert that the training programs provided by MARTA are not thorough enough and MARTA does not do anything to make sure their policies are being implemented by its employees.

### E. *Elevators*

Plaintiffs maintain that elevators at MARTA stations are frequently out of order, and that notice of this is only given to patrons when the elevator is out of service for a lengthy period of time. When notice is given, it is only given on the trains as they approach that particular station, not giving riders an opportunity to get off at an earlier stop and not notifying bus passengers at all. Furthermore, Plaintiffs contend that MARTA does not post alternative route information to those disabled patrons who need to use an elevator. (Connelly Aff. ¶ 3; Gainer Aff. ¶ 6; Mur-

ray Aff. ¶ 4; Nash Aff. ¶ 8.) Ms. Lynne Connelly and Ms. Ajani Murray describe one day in November 2001 when the elevator to the westbound platform in MARTA's Five Points station was not working. (Connelly Aff. ¶ 3; Murray Aff. ¶ 4.) They were, however, assisted by a MARTA employee who led them to a working elevator. (*Id.*) Ms. Kate Gainer testified that she has encountered "frequent" incidents of elevators not working in MARTA stations, but is only able to describe one specific incident in August 2001. (Gainer Aff. ¶ 4.) Ms. Grossman testified that she has found elevators at the Avondale and Decatur stations to be inoperable on four occasions. (Grossman Aff. ¶ 10.) Although Ms. Tiffany Nash claims that elevators at the East Lake and Decatur stations are "regularly" broken, she cites only two specific instances of inoperable elevators at the Vine City and East Lake stations. (Nash Aff. ¶ 8.) Plaintiff Davis claims to have encountered a total of five inoperable elevators at MARTA stations. (Davis Dep. at 14–15, 18–19, 23–24.) Plaintiffs Hasan Amin and Baker each allege to have encountered two inoperable elevators. (Hasan Amin Dep. at 96, 100; Baker Dep. at 65–66, 68.)

Mr. Kevin Wade is MARTA's Manager of Buildings & Support Equipment. He testified by affidavit that MARTA has a full service contract with Schindler Elevator Corporation to repair and maintain all of the elevators in MARTA's buildings and rail stations. (Wade Aff. ¶ 6.) He testified that Schindler is usually able to repair an elevator within a couple of hours of getting a call. (Wade Aff. ¶ 8) He testified that MARTA and Schindler have maintained an overall elevator availability of 99% since March, 2001. (Wade Aff. ¶ 11.) A system-wide overall check of all station elevators was completed in February 2002. (Wade Aff. ¶ 12.) Defendants assert that none of the witnesses testify that they were unable to reach their destination because of an inoperable elevator. At most they were

temporarily inconvenienced. Plaintiffs argue that they have presented evidence showing that MARTA does not make the proper accommodations for disabled customers when elevators are out of service and, thus, request a preliminary injunction.

## F. *Paratransit Operations*

As required by the ADA, MARTA provides a Complementary Paratransit Service in all areas within three-quarters of a mile of fixed route bus or train service. About 2,811 persons are certified by MARTA as paratransit eligible. From July 2000 through June 2001, MARTA provided 166,858 one-way paratransit trips using 94 minibuses. The one-way fare is $3.50, twice the full adult fixed route fare. Plaintiffs presented substantial evidence of individual problems with the paratransit system. Plaintiff Sandra Owen uses the paratransit services because she is confined to a wheelchair. The majority of her problems with the paratransit system are issues of lateness. Ms. Owen testified that on several occasions she was picked up outside her 30 minute window, often up to one and a half to two hours late. (Transcript at 46.) On one occasion she even suffered frostbite while waiting outside for a pick-up which was late on an extremely cold evening. (Transcript at 56–57.) In fact, Ms. Owen has kept records of her trips and she has determined that out of 66 trips after February, 2002, the paratransit service was late to pick her up 67% of the time. (Transcript at 57.) The Court found her testimony to be particularly credible and worthy of belief.

Ms. Carol Peay also testified about problems she has had with paratransit service. Ms. Peay maintains that "ready times" given to customers by MARTA are often changed without notifying the customer. For example, on one occasion, Ms. Peay was quoted a "ready time" of 9:57

A.M. She arrived downstairs to wait for the bus at 9:55 A.M. and remained there until 10:25 A.M. She then called customer service and they informed her that the driver had arrived at 9:51 A.M. and she had not been there. This was not the "ready time" she had been quoted. (Transcript at 63.)

Plaintiffs' complaints about the paratransit service are corroborated by a Federal Transit Administration ("FTA") assessment of MARTA's paratransit service. The assessment was conducted during September 2001. This assessment did not include any review of MARTA's fixed route system, only MARTA's paratransit services. The assessment sought to determine whether MARTA is illegally imposing limits on the number of paratransit riders it serves by either openly denying proper requests or making service so poor that it discourages riders from using it. "The assessments consider whether there are patterns or practices of a substantial number of trip limits; trip denials; early or late pick-ups or arrivals after desired arrival (or appointment) times; long trips; or long telephone hold times as defined by established standards (or typical practices if standards do not exist)." *MARTA ADA Complementary Paratransit Service Assessment, Final Report* (hereinafter "FTA Assessment"), March 19, 2002, at 1 [Doc. 28].

The FTA consultants determined that MARTA's paratransit service was deficient in numerous respects. As many as 6.5% of trip requests were initially denied. Between July 1999 and August 2001, MARTA denied from 0.1% to 6.3% of monthly trip requests and from 0.2% to 13.1% of demand trip requests. The assessment concluded that MARTA does not appear to have the capacity to provide reliable next

day service. Thirty eight percent of the next day requests observed by the assessment team were initially denied. The lack of adequate driver back-up capacity negatively impacts on-time performance and ride times. Schedulers do not maintain a log of callbacks to riders when negotiated pick-up times are changed. Drivers are not given scheduled breaks which makes them early on some trips and late on others in order to work in a break. In July and August 2001 on-time performance was below 85%. On-time performance was below 80 % for 12 days during this two month period. Of the 484 complaints on file at MARTA, 35% relate to on-time performance. Many trips are too long. Of the 24 trips analyzed in detail, 13 appeared to have significantly longer travel time by the paratransit service than by fixed route. The assessment concluded that the number of paratransit operators and the level of staffing paratransit reservations do not appear adequate to meet the demand for the service. Due to an inadequate number of scheduling and dispatch staffers, there was an exceedingly long hold time for callers. As many as 33% of reservation callers end up abandoning the call because of long wait times. For callers who could not remain on hold and left messages, 25% never received a return phone call. *Id.* at 25. The existence of capacity restraints, including trip denials, untimely service, and long ride times appears to have depressed demand for MARTA's paratransit service. *Id.* at 10–13. The assessment also found that a lack of stop announcements discouraged customers of the paratransit service from using MARTA's fixed route service. *Id.* at 14.

In late February 2002, MARTA responded to the FTA Assessment and did not deny the FTA's findings. *Id.* at Attachment A. Instead, it basically argued

that it was working on addressing the problems. MARTA asserted that certain service problems (such as trip denials) had decreased. *Id.* at 2–3. It did respond to the assessment by indicating that 56 additional paratransit operators would be hired and that it would seek budget approval to hire additional reservationists. *Id.* at 6. MARTA's response as to certain other problems was essentially that they would look into the matter. *Id.*

Yvonne White–Roberts is a Customer Relations Officer for MARTA who managed the Mystery Rider program until July 2001. She testified by affidavit that the Mystery Rider program is performed by an independent contractor that conducts approximately 50 trips a month on MARTA trains and buses. (White–Roberts Aff. ¶ 4.) In July 2001, MARTA began the process of adding specific questions relating to paratransit services into the Mystery Rider program. (White–Roberts Aff. ¶ 7.) The proposed paratransit questionnaire will be implemented in July 2002. (White Roberts Aff. ¶ 8.)

## II. INJUNCTIVE RELIEF STANDARD

"A preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter of Ass'n of General Contractors of America v. Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990). In order to obtain a preliminary injunction, the movant must demonstrate: "(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury

unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985); *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994).

Moreover, when a party seeks to enjoin a government agency, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "This 'well-established' rule bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Midgett v. Tri–County Metropolitan District of Oregon,* 74 F.Supp.2d 1008, 1012 (D.Or.1999), *aff'd* 254 F.3d 846 (9th Cir. 2001). *See also Brown v. Board of Trustees of LaGrange Ind. Sch. Dist.,* 187 F.2d 20 (5th Cir.1951)[1]. Therefore, any injunction against a state agency must be narrowly tailored to "fit the nature and extent" of the established constitutional or statutory violation. *See Gibson v. Firestone,* 741 F.2d 1268, 1273 (11th Cir.1984). Greater caution or care should be exercised where a government subdivision is involved, particularly where the injunction will require "detailed and continuous supervision" over the conduct of that subdivision. *Brown,* 187 F.2d at 24. Thus, Plaintiffs must show an even stronger likelihood of success when they request mandatory

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

injunctive relief rather than prohibitory injunctive relief against a government entity. *See Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir.1979).

## III. DISCUSSION

### A. Legal Framework

Section 504 of the Rehabilitation Act of 1973 was the first significant attempt at the federal level to combat discrimination against the disabled. The statute now reads:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). In general, the Rehabilitation Act was ineffective in reducing the barriers encountered by the disabled in employment, transportation and public accommodations. *Helen L. v. DiDario*, 46 F.3d 325, 331 (3rd Cir.1995).

■ In 1990, Congress passed the ADA. Title I of the ADA prohibits discrimination against the disabled in employment. 42 U.S.C. § 12111 *et seq.* Part A of Title II generally prohibits discrimination against qualified individuals with disabilities by public entities. 42 U.S.C. § 12131 *et seq.* Section 202 of the Act states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of such a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Part B of Title II describes certain actions by public entities in the area of public transportation that are considered discriminatory. 42 U.S.C. § 12141 *et seq.* As pertinent to the present action, Section 222 of Title II deems it discriminatory for a public entity that operates a fixed route system to, among other things, purchase or lease a new bus if the bus is "not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12142(a). Similarly, Section 223 deems it discriminatory for a public entity that operates a fixed route system to fail to provide paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, at a level comparable to services provided to individuals without disabilities.

> It shall be considered discrimination ... for a public entity which operates a fixed route system ... to fail to provide with respect to the operations of its fixed route system, ... paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, that are sufficient to provide to such individuals a level of service (1) which is comparable to the level of designated public transportation services provided to individuals without disabilities using the system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.

42 U.S.C. § 12143(a). In other words, the ADA does not require public transit agen-

cies to provide better service to disabled passengers than is provided to other passengers, only comparable service. *Midgett,* 74 F.Supp.2d at 1012. The Act authorizes the Secretary of Transportation to promulgate regulations to carry out the Act, including standards for facilities and vehicles. 42 U.S.C. § 12149. Title III of the ADA prohibits discrimination against the disabled in places of public accommodations and by certain private transportation services. 42 U.S.C. § 12181 *et seq.* MARTA is a public transportation provider subject to Title II of the ADA. As a public entity, it is subject to all of Title II, not simply the transportation provisions found in Part B of the Title. *Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207, 1210 (D.C.Cir. 1997). MARTA also receives federal financial assistance making it subject to § 504 of the Rehabilitation Act.

Title II of the ADA and § 504 of the Rehabilitation Act define discrimination broadly as (1) the exclusive from participation in the services, programs or activities of a public entity because of a disability; (2) the denial of the benefits of the services, programs or activities of a public entity because of a disability; or (3) being subjected to discrimination by any public entity. 42 U.S.C. § 12132; 29 U.S.C. § 794. Title II also contains specific provisions that define discrimination in the transportation context. See 42 U.S.C. §§ 12142, 12143, 12144, 12146, 12147 and 12148. These specific transportation provisions also define discrimination for purposes of the Rehabilitation Act. *Id.*

There are a number of regulations adopted by the Secretary of Transportation that are relevant to the Plaintiffs' claims. Because they are expressly authorized by Congress, the Court must give these regulations "legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984). "Public and private entities providing transportation services shall maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities." 49 C.F.R. § 37.161(a). "These features include, but are not limited to, lifts and other means of access to vehicles, securement devices, elevators, signage and systems to facilitate communications with persons with impaired vision or hearing." *Id.* "Accessibility features shall be repaired promptly if they are damaged or out of order. When an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature." 49 C.F.R. § 37.161(b). This regulation "does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 49 C.F.R. § 37.161(c).

Public entities providing transportation services by non-rail vehicles "shall establish a system of regular and frequent maintenance checks of lifts sufficient to determine if they are operative." 49 C.F.R. § 37.163(b). "[W]hen a lift is discovered to be inoperative, the entity shall take the vehicle out of service before the beginning of the vehicle's next service day and ensure that the lift is repaired before the vehicle returns to service." 49 C.F.R. § 37.163(d). "If there is no spare vehicle available to take the place of a vehicle with an inoperable lift, such that taking the vehicle out of service will reduce the transportation service the entity is able to pro-

vide, the public entity may keep the vehicle in service with an inoperable lift for no more than ... three days (if the entity serves an area of over 50,000 population) from the day on which the lift is discovered to be inoperative." 49 C.F.R. § 37.163(e). "In any case in which a vehicle is operating on a fixed route with an inoperative lift, and the headway to the next accessible vehicle on the route exceeds 30 minutes, the entity shall promptly provide alternative transportation to individuals with disabilities who are unable to use the vehicle because its lift does not work." 49 C.F.R. § 37.163(f). "The entity shall permit individuals with disabilities who do not use wheelchairs, including standees, to use a vehicle's lift or ramp to enter the vehicle." 49 C.F.R. § 37.165(g).

On fixed route systems a public entity providing transportation services "shall announce stops ... at least at transfer points with other fixed routes, other major intersections and destination points, and intervals along a route sufficient to permit individuals with visual impairments or other disabilities to be oriented to their location." 49 C.F.R. § 37.167(b)(1). "The entity shall announce any stop on request of an individual with a disability." 49 C.F.R. § 37.167(b)(2). "Where vehicles or other conveyances for more than one route serve the same stop, the entity shall provide a means by which an individual with a visual impairment or other disability can identify the proper vehicle to enter or be identified to the vehicle operator as a person seeking a ride on a particular route." 49 C.F.R. § 37.167(c). "The entity shall make available to individuals with disabilities adequate information concerning transportation services. This obligation includes making adequate communications capacity available, through accessible formats and technology, to enable users to obtain infor-

mation and schedule service." 49 C.F.R. § 37.167(f).

The regulations also establish service criteria for paratransit services. "The entity shall schedule and provide paratransit service to any ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day." 49 C.F.R. § 37.131(b). "Reservations may be taken by reservation agents or by mechanical means." *Id.* "The entity may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit eligible individual to schedule a trip to begin more than one hour before or after the individual's desired departure time." 49 C.F.R. § 37.131(b)(2). A public transit system shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by "[a]ny operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons." 49 C.F.R. § 37.131(f). "Such patterns or practices include, but are not limited to, the following: (A) Substantial numbers of significantly untimely pickups for initial or return trips; (B) Substantial numbers of trip denials or missed trips; (C) Substantial numbers of trips with excessive trip lengths." 49 C.F.R. § 37.131(f)(3)(i). "Operational problems attributable to causes beyond the control of the entity (including, but not limited to, weather or traffic conditions affecting all vehicular traffic that were not anticipated at the time a trip was scheduled) shall not be a basis for determining that such a pattern or practice exists." 49 C.F.R. § 37.131(f)(3)(ii).

B.  *Injunctive Relief*

1.  *Substantial Likelihood of Success on the Merits*

■ Generally, to establish a violation of the ADA and Rehabilitation Act, the Plain-

tiffs must prove: (1) that they have disabilities; (2) that they were otherwise qualified for the benefit or service in question; and (3) that they were subjected to unlawful discrimination because of their disabilities. *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1526 (11th Cir.1997). Plaintiffs can clearly satisfy the first and second elements to establish violations of the ADA and the Rehabilitation Act. The ADA and the Rehabilitation Act define the term "disability" to mean a physical or mental impairment that substantially limits one or more of the major life activities, a record of such impairment, or being regarded as having such impairment. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.104; 29 U.S.C. § 705(20)(B). Physical and mental impairments means:

> Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic, and lymphatic, skin and endocrine.

28 C.F.R. § 35.104. Specifically, physical and mental impairment includes such conditions as orthopedic, visual, speech and hearing impairments, and cerebral palsy. *Id.* Each of the Plaintiffs is "disabled" under the ADA and the Rehabilitation Act. Plaintiffs Vincent Martin, Brent Reynolds and Empish Thomas are blind or visually impaired. Plaintiffs Stephanie C. Davis and Betty Hasan Amin have quadriplegia. Plaintiff Sherman Baker has cerebral palsy. Each Plaintiff is substantially impaired in several major life activities as a result of their disabilities and, thus, is "disabled" for purposes of the ADA and the Rehabilitation Act.

The Plaintiffs also satisfy the second element as they are qualified for the benefits in question. MARTA provides public transportation for much of metropolitan Atlanta. The benefits of its fixed route service are open to anyone with fare for the bus or train. MARTA's paratransit service is open to people with disabilities who meet the eligibility criteria established by MARTA and governed by 49 C.F.R. §§ 37.123–125. MARTA has certified Plaintiffs Baker, Thomas, Davis and Hasan Amin as being eligible for paratransit service and provides paratransit service to these Plaintiffs. Clearly, all of the Plaintiffs are qualified for the benefits in question and satisfy the second requirement to prove a violation of ADA and Rehabilitation Act.

■■ The third element presents the crucial issue of whether the Plaintiffs were subjected to unlawful discrimination because of their disabilities. In order to succeed on their claims, it is not necessary that Plaintiffs show intentional discrimination. The Supreme Court has recognized that discrimination against the disabled is typically due to "apathetic attitudes rather than affirmative animus." *Alexander v. Choate,* 469 U.S. 287, 296, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The ADA is intended to combat not only intentional discrimination, but also benign neglect, apathy and indifference so that qualified individuals receive transportation services in a manner consistent with basic human dignity. *Helen L.,* 46 F.3d at 335. Plaintiffs' Complaint alleges numerous discriminatory acts in violation of Title II of the ADA and § 504 of the Rehabilitation Act. *See* Complaint §§ 53, 54, 59, 60. This Court finds that Plaintiffs have shown sufficient likelihood of success on the merits in several of their claims against Defendant MARTA.

### a. Information in Accessible Formats

MARTA makes schedule and route information freely available to the general public. This information is contained in maps and brochures available at MARTA stations. The information is also accessible to the general public on MARTA's web site. The information is not equally accessible to disabled persons, particularly the visually impaired. Although particular route and schedule information is available by telephone, this is not the equivalent to what MARTA provides to the general public. MARTA can do a better job of making information available in accessible formats to the visually impaired. This Court holds that the Plaintiffs have met their burden to show a likelihood of success on the merits for Defendants' failure to make available to individuals with disabilities adequate information concerning transportation services through accessible formats and technology to enable users to obtain information and schedule service. 49 C.F.R. § 37.167(f); 28 C.F.R. § 35.160. A disabled transit user cannot adequately use the bus system if schedule and route information is not available in a form he or she can use. 49 C.F.R. Part 37, Appendix D, at 536.

The Court accepts the testimony from MARTA that it will provide individual schedules in Braille as requested, but that it is not feasible, practical or cost effective to provide the entire 190 route bus service schedule in Braille. It appears from the evidence presented that disabled individuals can either use MARTA's information telephone number to receive scheduling information or request information in alternative formats through MARTA's Customer Service department. These procedures, if implemented properly, would follow the guidelines set forth in the ADA. Where MARTA seems to fall short is in the implementation of both of these procedures. Here, as elsewhere, it must deliver on its promises. There should not be a lengthy wait time when you call MARTA's information telephone number; you should be able to receive comprehensive information from a representative and it should not take months to receive a requested Braille schedule. MARTA representatives also concede that the system's web page is not formatted in such a way that it can be read by persons who are blind but who are capable of using text reader computer software for the visually impaired. (Greider Aff. ¶ 5,6.) However, it now appears that MARTA is attempting to correct this problem. Until these deficiencies are corrected, Marta is violating the ADA mandate of "making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service." 49 C.F.R. § 37.167(f).

### b. Wheel Chair Access to Buses

As previously noted, public entities providing transportation services by non-rail vehicles "shall establish a system of regular and frequent maintenance checks of lifts sufficient to determine if they are operative." 49 C.F.R. § 37.163(b). The point of a preventive maintenance program is to prevent breakdowns. But it is also important to catch broken lifts as soon as possible, so that they can be repaired promptly. 49 C.F.R. Part 37, Appendix D. at 534. In a bus system with relatively low lift usage, it is possible that a vehicle could go for a number of days without carrying a passenger who uses the lift. *Id.* It is highly undesirable for the next passenger who needs a lift to be the person who discovers that the lift is broken,

when a maintenance check by the operator could have discovered the problem days earlier, resulting in its repair. *Id.* It is a violation of the regulations for MARTA to neglect to check lifts regularly and frequently, or to exhibit a pattern of lift breakdowns in service resulting in stranded passengers due to failure to inspect the lifts. *Id.*

When a lift breaks down in service, the driver must let the transit service know about the problem by the most immediate means available. *Id.* When a lift is discovered to be inoperative, either because of an in-service failure or as the result of a maintenance check, the transit service must take the vehicle out of service before the beginning of its next service day and repair the lift before the vehicle is put back into service. *Id.* If there is no spare vehicle (either accessible or ˙inaccessible) available to take the place of the vehicle with an inoperative lift, such that putting the latter vehicle into the shop would result in a reduction of service to the public, the provider may keep the vehicle with the inoperative lift in service for a maximum of three days. *Id.* During the three-day period, if an accessible spare bus becomes available at any time, it must be used in place of the bus with the inoperative lift or an inaccessible spare that is being used in its place. *Id.* In a fixed route system, if a bus is operating without a working lift, and headways between accessible buses on the route on which the vehicle is operating exceed 30 minutes, the transit service must accommodate passengers who would otherwise be inconvenienced by the lack of an accessible bus. *Id.*

Plaintiffs have presented credible evidence that there is a widespread and systematic problem of inoperable wheelchair lifts. The Court is persuaded that the

Plaintiffs' evidence demonstrates a pattern of lift breakdowns in service resulting in stranded passengers due to failure to inspect the lifts, or failure to repair them in a timely fashion, or failure to provide alternative transportation. Although MARTA has policies in effect to address the problem, it is evident that those policies are not working. MARTA's witnesses concede that maintaining the wheelchair lifts on the older buses is a˙ problem. Part of the problem is that MARTA does not have an adequate system of investigating and following up on complaints from customers, particularly complaints implicating ADA requirements. MARTA has not presented evidence of any bus operator being disciplined for failure to report an inoperable lift. MARTA's current policies are not working, and Plaintiffs have demonstrated a likelihood of success on the merits as to violation of the ADA due to a widespread and systemic problem of inoperable wheelchair lifts on Marta's fixed route bus system.

### c.  *ADA Stop Announcements*

Plaintiffs have also met their burden in showing a likelihood of success on the merits for MARTA's bus and rail operators' failure to make ADA required stop announcements. "On fixed route systems, the entity must˙ announce stops. These stops must include transfer points with other fixed routes. This means ˙that any time a vehicle is to stop where a passenger can get off and transfer to another bus or rail line . . . ˙the stop would be announced." 49 C.F.R. Pt. 37, App. D, at 536. "Announcements must also be made at major intersections or destination points. . . . In addition, the entity must make announcements at sufficient intervals along a route to orient a visually impaired passenger to his or her location . . . the entity must

announce any stop request by a passenger with a disability, even if it does not meet any of the other criteria for announcement." *Id.*

This Court finds that although MARTA policy requires its fixed route operators to make the stop announcements required by the ADA, Plaintiffs have produced overwhelming evidence to show that the operators are regularly and systematically failing to make the required announcements. The documentation of the problem by Plaintiff Reynolds and Ms. Grossman is particularly credible and compelling. MARTA has not introduced any evidence that a bus or rail operator has ever been disciplined for not announcing stops. Again, MARTA must practice what it promises. Until it does, it is violating the ADA.

### d. *Training*

The Department of Transportation recognizes the important role that training plays in the provision of public transit services to the disabled. "Each public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities." 49 C.F.R. § 37.173. "A well-trained workforce is essential in ensuring that the accessibility-related equipment and accommodations required by the ADA actually result in the delivery of good transportation service to individuals with disabilities." 49 C.F.R. Part 37, App. D, at 538. "[E]very employee of a transportation provider who is in-

volved with service to persons with disabilities must have been trained so that he or she knows what needs to be done to provide the service in the right way. When it comes to providing service to individuals with disabilities, ignorance is no excuse for failure." *Id.* "An employee who has forgotten what he was told in past training sessions, so that he or she does not know what needs to be done to serve individuals with disabilities, does not meet the standard of being trained to proficiency." *Id.* The Department of Transportation "urges entities to consult with disability organizations concerning how to train their personnel. Involving these groups in the process of establishing training programs, in addition to providing useful information, should help to establish or improve working relationships among transit providers and disability groups that, necessarily, will be of long duration." *Id.*

The Court is persuaded that inadequate training is responsible for many of MARTA's problems in providing reliable transportation services to the disabled. Until recently, ADA training was provided to bus operators only when they were initially hired. MARTA has now begun refresher courses, and certainly that needs to be continued if not expanded. The Court is also persuaded that relying upon general orders posted on bulletin boards has not proven to be an effective means of communicating to bus and rail operators the policies and procedures that MARTA says are in force to comply with the ADA. For example, the Court finds that it is inexcusable that the "Red Book" has not been revised since the passage of the ADA. Revising the "Red Book" to include matters such as daily cycling of lifts, the procedure to be followed upon discovery of inoperable lifts and the necessity of making stop announcements would be a signifi-

cant step in the direction of assuring ADA compliance in practice as well as theory. In summary, the Court finds that MARTA has systematically violated the ADA by not providing adequate training to its bus and rail operators and their supervisors.

### e. *Elevators*

Failure to make key stations in rapid rail and light rail systems "readily accessible to individuals with disabilities, including individuals who use wheelchairs," constitutes discrimination. 42 U.S.C. § 12147(b)(1). Plaintiffs contend that MARTA discriminates against the disabled by failing to maintain the elevators in the train stations. Public entities providing transportation services must "maintain in operative condition those features of facilities ... that are required to make the vehicles and facilities readily accessible." 49 C.F.R. § 37.161(a). Accessibility features must be repaired promptly and the public entity must take reasonable steps to accommodate individuals with disabilities who would otherwise use a malfunctioning feature. 49 C.F.R. § 37.161(b). The regulation, however, "does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 49 C.F.R. § 37.161(c). A pattern of unreliable elevator service constitutes a violation of the ADA. *Cupolo v. Bay Area Rapid Transit*, 5 F.Supp.2d 1078, 1083–84 (N.D.Cal.1997). Although Plaintiffs have documented a number of cases where they encountered inoperable elevators in MARTA stations, their evidence is insufficient to demonstrate a systemic problem that would rise to the level of an ADA violation. It is simply a fact of life that elevators will break down on occasion. At least since March, 2001, it appears to the Court that MARTA's policies and procedures for elevator repair and maintenance have been adequate to comply with the ADA. With respect to elevator maintenance, the Plaintiffs have not shown that there has been a wholesale or systemic failure to follow its own policies and procedures amounting to a denial of adequate service to the disabled.

### f. *Paratransit Service*

A paratransit system must provide its users with a level of service that is comparable to that provided to nondisabled passengers by its counterpart fixed route system. 42 U.S.C. § 12143(a); *see generally Liberty Resources, Inc. v. Southeastern Pennsylvania Transportation Auth.*, 155 F.Supp.2d 242 (E.D.Pa.2001). A public transit service is prohibited from limiting or discouraging paratransit use through "any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons." 49 C.F.R. § 37.131(f).

In viewing the evidence as a whole, the Court is persuaded that operational patterns and practices in MARTA's paratransit service have significantly limited the availability of service to paratransit eligible persons in violation of the ADA. It is undisputed that as late as October 2001, paratransit dispatchers were changing "ready times" on the schedules so that they would not be held responsible for "missed trips." (Michael Fredericks Aff. ¶ 8.) Although on-time performance has improved since January 2002, almost one in ten is still late. (Michael Fredericks Aff., Ex. 4.) Most compelling, perhaps, is the FTA Assessment. This systematic assessment of the paratransit service corroborates the anecdotal complaints of the Plaintiffs. There is ample evidence that the paratransit staffing is insufficient and this problem impacts the scheduling of

trips, "ready times", no show policies and trip times. Paratransit customers requesting reservations should not be put on hold for excessively long periods. Furthermore, when they make a reservation they should be notified of their "ready time" and this should not be changed without properly notifying the customer. In addition, it seems reasonable that a customer should not be charged for "no shows" if the paratransit vehicle arrives more than 30 minutes after the "ready time." Finally, paratransit customer service should be equipped to handle complaints by customers in a professional manner. These are all examples of comparable services provided to customers on the fixed-route system and thus, should be extended to paratransit customers. This Court holds that a preliminary injunction is appropriate to ensure MARTA's compliance with the ADA in regard to the paratransit system.

### g. Other Claims

In their proposed order, Plaintiffs address the issue of proper securement of wheelchairs in buses. This issue was not raised in the original or amended Motion for Preliminary Injunction, and the Court declines to address the merits of this issue for that reason. In their Complaint, Plaintiffs make other claims. For example, they claim that MARTA violates the ADA by failing to ask non-disabled riders to give up seats or wheelchair securement locations to disabled riders. See 49 C.F.R. § 37.167(j). The Plaintiffs have not offered evidence of a significant pattern of violations and, therefore, have not shown a likelihood of success on the merits as to these other claims.

### 2. Substantial Threat of Irreparable Injury

A plaintiff seeking an injunction against a local or state government must present facts showing a threat of immediate, irreparable harm before a federal court will intervene. *Rizzo v. Goode*, 423 U.S. 362, 378–79, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Defendants argue that Plaintiffs' testimony shows only that disabled individuals are sometimes inconvenienced by occasional equipment malfunctions or an uncooperative driver. They argue that this is insufficient to show irreparable injury. Defendants assert that this case is factually similar to the case of *Midgett v. Tri–County Metro. Transp. Dist. of Oregon*, 74 F.Supp.2d 1008 (D.Or.1999), *aff'd*, 254 F.3d 846 (9th Cir.2001). In that case, the plaintiff alleged that Tri–Met had violated Title II of the ADA by, among other things, failing to maintain wheelchair lifts, failing to implement an effective system of regular and preventive maintenance for the lifts, and failing to operate a sufficient number of paratransit vehicles. *Midgett*, 74 F.Supp.2d at 1010–1011. The plaintiff submitted his own and other passengers' descriptions of "incidents of lift failures, improper securement, operator carelessness or indifference, and customer apathy." *Id.* at 1017. Tri–Met presented extensive evidence showing that it had several specific programs in place to address ADA issues, including a procedure to give ADA-related complaints priority treatment, training programs designed to instruct employees on how to address ADA-related issues, periodic quality control inspections by outside parties, and specific practices with regard to ADA-related failures. *Id.* at 1015–16.

Based on these facts, the district court in *Midgett* found that, "when viewed in the larger context of Tri–Met's entire fixed route system," the occasional problems experienced by the plaintiff were not violative of the ADA and, therefore injunctive relief was unwarranted. *Id.* at 1018. The

district court stated that "a strong factual record showing an intentional and pervasive pattern of misconduct" was required to issue an injunction. In affirming this decision, the Ninth Circuit Court of Appeals pointed out that equitable remedies for violations of the ADA are available regardless of a defendant's intent. But it agreed with the district court's decision to deny relief.

> Plaintiff's evidence establishes several frustrating, but isolated, instances of malfunctioning lift service on Tri–Met. The evidence also shows that, unfortunately, a few individual Tri–Met operators have not treated passengers as they are required and are trained to do. Under the regulations, these occasional problems do not, without more, establish a violation of the ADA. At most, the evidence shows past violations of the ADA. It does not, however, support an inference that Plaintiff faces a real and immediate threat· of continued, future violations of the ADA in the absence of injunctive relief.

*Midgett,* 254 F.3d at 850. The Court of Appeals appropriately noted that a recent FTA review had found that Tri–Met was in compliance with the ADA. In this case, by contrast, the Plaintiffs have established a strong factual record of more than isolated incidents of poor service. Their complaints ·are corroborated by the findings of the FTA that MARTA's paratransit operation is not in compliance with the ADA. Therefore, *Midgett* is not persuasive authority for denying relief in this case.

■ MARTA also contends that it has improved its service in recent months and that the problems identified by the Plaintiffs have been rectified. Voluntary cessation of illegal conduct does not render a challenge to that conduct moot unless (1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Los Angeles County v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1247 (11th Cir.1998); *Barnes v. Healy,* 980 F.2d 572, 580 (9th Cir.1992). Improvements in service will not preclude injunctive relief where there has been a clearly established pattern of failing to provide an acceptable level of service to the disabled. *Cupolo v. Bay Area Rapid Transit,* 5 F.Supp.2d 1078, 1084 (N.D.Cal.1997). The testimony presented at the evidentiary hearing corroborated by the FTA assessment is sufficient to establish such a pattern. It appears to the Court that MARTA did not seriously address these° issues until forced to do so by the FTA Assessment and the threat of this litigation. The Court is not persuaded that recent improvements in service to the disabled make an injunction unnecessary.

■ The goal of the ADA is "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for the disabled. 42 U.S.C. § 12101. At the evidentiary hearing, the Court was impressed by the heroic efforts of Plaintiffs to overcome the daily obstacles they face in their quest to achieve independent living and economic self-sufficiency. In this case, Plaintiffs will be irreparably injured in the absence of a preliminary injunction, as a result of MARTA's continued failure to accommodate their disabilities and to provide them full and equal access to public transportation.

### 3. *Balancing the Harms*

The implementing regulations of Title II of the ADA lay out very specific require-

ments for the operation of public transportation services. Defendants have failed to comply with several of these requirements. The balance of harms in this case tips sharply in the favor of issuing a preliminary injunction because the Defendant has not shown any cognizable injury that would result. An injunction is an appropriate mechanism to ensure that competing priorities do not overwhelm MARTA's obligation to comply with the ADA. *Cupolo v. Bay Area Rapid Transit*, 5 F.Supp.2d 1078, 1085 (N.D.Cal.1997). In the particular facts of this case, an injunction is an appropriate means of guaranteeing that recent improvements in service and plans for added personnel are carried through and do not once again become victims of competing priorities.

#### 4. *The Public Interest*

Congress stated in the enactment of the ADA that it is in the public interest to eliminate discrimination against individuals with disabilities. *See* 42 U.S.C. § 12101. Granting the preliminary injunction would serve that public interest in providing accessible public transportation to individuals with disabilities throughout metropolitan Atlanta. The public has an interest in the full participation of the disabled in the economic, social and recreational life of the community. *Tugg v. Towey*, 864 F.Supp. 1201, 1211 (S.D.Fla.1994). Unreliable transportation affects not only the disabled. Their relatives, friends, employers and physicians, among others, are all affected. For example, Plaintiff Sandra Owen's students are affected when she is late for the class she teaches because the paratransit bus is late. Issuing a preliminary injunction to ensure equal access to

public transportation for individuals with disabilities is in the pubic interest.

### III. CONCLUSION

Plaintiffs are among an estimated 24 million[2] disabled Americans who are dependent upon public transportation. Plaintiffs and other members of the disabled community who attended the June and August hearings are making heroic efforts to overcome the daily obstacles they encounter in their quest for independent living and economic self-sufficiency. They must rely upon MARTA for their daily transportation needs if they are to live active lives in the community, to work and pay taxes and avoid complete dependency upon the public dole or private charity. The ADA embodies a national policy that encourages self-reliance and self-sufficiency. Pursuant to the ADA, Plaintiffs are entitled to receive a level of service which is comparable to that MARTA provides to the non-disabled. Plaintiffs have convinced this Court that MARTA is not providing that level of service to the disabled. It should do better.

For the reasons set forth above, Plaintiffs' Motion for a Preliminary Injunction against Metropolitan Atlanta Rapid Transit Authority ("MARTA") [Doc.15 & 25] is GRANTED IN PART AND DENIED IN PART as to liability. The parties are directed to confer in a good faith attempt to agree upon an appropriate remedies Order that is narrowly tailored to address the violations of the ADA outlined in this Order. In some areas, it may be that the appropriate remedy is to order continuation of MARTA's current plans to improve service to the disabled. The parties are

---

**2.** Michael Lewyn, *'Thou Shalt Not Put a Stumbling Block Before the Blind': The Ameri-* cans With Disabilities Act and Public Transit for the Disabled, 52 Hastings L.J. 1037 (2001).

encouraged to consider employing an experienced transportation expert as mediator to assist in fashioning an appropriate Order. Participation in this process shall be without prejudice as to the right of any party to appeal any grant or denial of relief ultimately ordered by the Court. The parties shall provide a status report to the Court within 30 days from the docketing of this Order with respect to their success or failure to agree upon an Order.

SO ORDERED.