[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-11197

_____

D. C. Docket No. 00-00830-CV-FAM

SERGIO RENDON, JOHNPAUL JEBIAN,
CHRIS LEONE, JOANN M. NORRIS,
KELLY-GREENE, all individually
and on behalf of all others
similarly situated,

                                                            Plaintiffs-Appellants,

versus

VALLEYCREST PRODUCTIONS, LTD.,
ABC TELEVISION NETWORK, INC.,

                                                            Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 18, 2002)

Before BARKETT and MARCUS, Circuit Judges, and MILLS*, District Judge.

_____

*Honorable Richard Mills, U. S. District Court Judge, Central District of Illinois, sitting by
designation.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2002
THOMAS K. KAHN
CLERK

BARKETT, Circuit Judge:

Sergio Rendon, JohnPaul Jebian, Chris Leone, JoAnn M. Norris, and Kelly Greene ("Plaintiffs"), appeal the dismissal of their Title III class action complaint, brought on behalf of themselves and similarly situated hearing-impaired and mobility-impaired individuals. The complaint alleges that Valleycrest Productions Limited ("Valleycrest") and the American Broadcasting Network, Inc. ("ABC") (collectively "Defendants") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et seq., by operating a telephone selection process that screened out disabled individuals who wished to be contestants on the show "Who Wants To Be A Millionaire" ("Millionaire"). The district court dismissed Plaintiffs' complaint upon finding that, because the automated telephone contestant selection process was not conducted at a physical location, it was not a place of "public accommodation" under the ADA. Plaintiffs now appeal. For the reasons discussed below, we conclude that Plaintiffs state a valid Title III claim in alleging that the contestant hotline was a discriminatory procedure that screened out disabled persons aspiring to compete on Millionaire, a place of public accommodation. We therefore REVERSE and remand.

## BACKGROUND

ABC and Valleycrest produce the television quiz show Millionaire. The

program is filmed at ABC's New York City production studio, and contestants are selected for appearance on the program via an automated telephone answering system. Aspiring contestants call a toll-free number on which a recorded message prompts them to answer a series of questions. Callers record their answers to these questions by pressing the appropriate keys on their telephone keypads. Callers who answer all of the questions correctly in the first round of the competition (the "fast finger process") are then subject to a random drawing to narrow the contestant field, and the selected individuals proceed to the second round, in which they are required to answer additional trivia questions. Of the approximately 240,000 persons who call the contestant hotline each day to compete on Millionaire, only 6% proceed to the second round.

In this case, the named plaintiffs are persons with hearing and upper-body mobility impairments who sought selection to compete on Millionaire by calling the automated hotline, but who could not register their entries, either because they were deaf and could not hear the questions on the automated system, or because they could not move their fingers rapidly enough to record their answers on their telephone key pads. Specifically, Rendon, Leon and Norris suffer from a condition that limits their finger mobility. Jebian could not record his answers because he could not hear the pre-recorded questions and no Telecommunications Devices for

3

the Deaf services[1] ("TDD services") were made available. Kelly Greene, the last named plaintiff, is the Director of the Center for Independent Living, and seeks relief on behalf of his disabled clients who had attempted to compete for the game on the hotline.

Plaintiffs filed a class action complaint alleging that Valleycrest and ABC were in violation of the ADA because the telephone contestant selection process for Millionaire tended to screen out hearing-impaired or upper-body mobility-impaired persons. Plaintiffs allege that they can be reasonably accommodated through the use of several well established technological devices, such as TDD services, which would permit them to participate in the existing fast finger competition.

Defendants moved to dismiss Plaintiffs' complaint, arguing that the Title III requirements did not apply to the contestant hotline because the protections of Title III are limited to physical locations; that is, they guarantee the disabled fair access

---

[1] A TDD machine allows a deaf person to conduct a telephone conversation with another person by typing comments into a "relay" device. When one deaf person calls another deaf person, the caller types his message into the TDD machine, and the message is then transferred across standard telephone lines to the recipient's TDD machine and displayed on the recipient's TDD video screen. The recipient sends response messages in the same manner. When a deaf person calls a hearing person, the TDD relays the text message to a telephone relay operator who reads the deaf person's responses aloud to the hearing person, and also transcribes the hearing person's verbal messages to be relayed to the deaf person's TDD machine. Since 1990, the ADA has required telecommunication carriers nationwide to provide TDD relay operators to their customers as a standard service, thereby providing the necessary intermediaries for communication between deaf and hearing telephone users. See 47 U.S.C. § 225(a)(2).

4

only to privileges and services that are offered from a physical "public accommodation."

The district court granted the motion to dismiss, holding that Title III is inapplicable to the defendants' automated telephone system of selecting contestants to participate on the Show because the system is not administered at a palpable public accommodation. This appeal followed, with the Department of Justice intervening and joining Plaintiffs' argument that Title III precludes the sort of screening mechanism used to select Millionaire contestants.[2]

## DISCUSSION

We review de novo the dismissal of a complaint for failure to state a claim, construing all allegations in the complaint as true and in the light most favorable to the plaintiff. See Lowell v. Am. Cyanamid Co., 177 F.3d 1228, 1229 (11th Cir. 1999). Dismissal under Rule 12(b)(6), Fed. R. Civ. P., is appropriate "only if it is

---

[2]After the district court dismissed Plaintiffs' first amended complaint, Plaintiffs moved to file a second amended complaint to clarify the allegation that the fast finger contestant hotline was a discriminatory procedure that deprived them of the opportunity to compete to be a contestant on the Millionaire game show, a privilege provided at a "place of public accommodation" as defined in 42 U.S.C. § 12181(7). Finding little difference between the allegations in the first and second amended complaints, the district court denied the motion. In addition to appealing the dismissal of the first amended complaint, Plaintiffs argue that the district court abused its discretion by refusing to permit leave to file a second amended complaint.

We need not address this issue for the purposes of this appeal because we determine that the district court erred by granting Defendants' motion to dismiss the first amended complaint, and because we find that in all pertinent respects the allegations stated in the second amended complaint were also contained in the first amended complaint.

clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" of the complaint. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

42 U.S.C. § 12182(a) outlines Title III's purpose in general terms, providing that

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

The statute in turn lists those entities regulated under the statute as places of "public accommodation," explaining that an entity is covered if its operations "affect commerce," and it falls within one of twelve enumerated categories. 42 U.S.C. § 12181(7)(A)–(L).[3] The categories of covered entities include, inter alia, "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment." 42 U.S.C. § 12181(7)(C).

The ADA also precisely defines the term "discrimination" in section 12182(b)(2)(A)(i), which, inter alia, prohibits

> the imposition or application of eligibility criteria that screen out or

---

[3]28 C.F.R. § 36.104 further explains the class of "public accommodations" covered under Title III, defining a public accommodation as a "place" or "a facility, operated by a private entity, whose operations affect commerce" and which falls under one of the twelve public accommodation categories listed under § 12181(7).

6

tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered . . . .[4]

Our inquiry is confined solely to the district court's bases for dismissing the plaintiffs' complaint for failure to state a claim. At this juncture, on the record before us, this case does not involve issues regarding the reasonableness of any proposed accommodations, or require us to resolve whether any proposed accommodations or auxiliary services would constitute an "undue burden" to the Millionaire program. See 42 U.S.C. § 12182(b)(2)(A)(iii). Rather, this appeal involves only the question of whether Title III encompasses a claim involving telephonic procedures that, in this case, tend to screen out disabled persons from

---

[4]Subsections (ii) and (iii) further prohibit:

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(ii)–(iii).

7

participation in a competition held in a tangible public accommodation. Under a plain reading of the foregoing provisions, then, in order to state a valid claim, Plaintiffs must allege that they suffer from disabilities, and that Defendants' imposition or application of unnecessary eligibility criteria has screened them out or tended to screen them out from accessing a privilege or advantage of Defendants' public accommodation.

Plaintiffs' complaint clearly makes the requisite allegations,[5] and moreover, a number of the assertions are uncontested for the purposes of the motion to dismiss now on appeal in this case. Defendants concede that Plaintiffs are disabled as defined by the ADA. Defendants also concede, and we agree, that the Millionaire show takes place at a public accommodation (a studio) within the meaning of 42 U.S.C. § 12181(7)(C) (covering theaters and other places of entertainment), and that the automatic process used to select contestants tends to "screen out" many disabled individuals as described in section 12182(b)(2)(A)(i). Lastly, Defendants concede that the opportunity to appear on Millionaire and

---

[5]Specifically, the complaint avers that: "Defendants . . . discriminate against [Plaintiffs] on the basis of a disability . . . in the denial of the opportunity . . . to be a contestant and participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the network television quiz show entitled 'Who Wants To Be A Millionaire,'" and that "Defendants impose[] or implement[] eligibility criteria that screen out or tend to screen out individual[s] with a disability . . . from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations being offered." Am. Compl. at 10–11.

compete for one million dollars is a privilege or advantage as those terms are defined by the ADA (although they specifically refer to the Show as a "good or service" of the studio, rather than as a privilege or advantage thereof).

Having conceded nearly all of the requisite elements of a valid Title III claim, Defendants nonetheless contend that they are entitled to dismissal because Plaintiffs have failed to assert that Defendants erected "barriers to the entry of disabled persons into the auditoriums or studios in which the Show is recorded." Br. of Appellee at 9. As we understand their contention, Defendants argue that the Millionaire contestant hotline may not serve as the basis for a Title III claim because it is not itself a public accommodation or a physical barrier to entry erected at a public accommodation.

We find this argument entirely unpersuasive. A reading of the plain and unambiguous[6] statutory language at issue reveals that the definition of discrimination provided in Title III covers both tangible barriers, that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42

---

[6]As in all disputes involving issues of statutory construction, we begin with the plain language of the statute. See, e.g., K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988). "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). Where the statute conveys a plain and unambiguous meaning, we look no further. Id.

9

U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(i)–(ii).[7]  There is nothing in the text of the statute to suggest that discrimination via an imposition of screening or eligibility requirements must occur on site to offend the ADA.

In support of their assertion to the contrary, Defendants rely primarily on Stoutenborough v. Nat'l Football League, Inc., 59 F.3d 580 (6th Cir. 1995), in which a group of hearing-impaired plaintiffs sued the NFL and the Cleveland Browns football team seeking to eliminate a so-called "blackout rule" that prohibited live video broadcasts of football games that were not sold out.  The Stoutenborough plaintiffs argued that, because they were unable to hear the broadcasts of the games offered on the radio, the "blackout rule" effectively deprived them of the opportunity to enjoy a live broadcast of the games, while hearing persons could enjoy them.  The plaintiffs sought a court order to compel the NFL and the Browns to broadcast all live games on television.

The Sixth Circuit upheld the district court's dismissal of the suit, citing two

_____

[7]The statute also recognizes that an intangible barrier may result as a consequence of a defendant entity's failure to act, that is, when it refuses to provide a reasonable auxiliary service that would permit the disabled to gain access to or use its goods and services.  42 U.S.C. § 12182(b)(2)(A)(iii).

reasons.  First, the Court determined that the blackout rule was not discriminatory, because it applied equally to the hearing and the hearing-impaired; both groups were precluded from viewing blacked-out home football games.  Id. at 582.  The mere fact that hearing persons could listen to the games on the radio was insignificant, since the rule did not attempt to regulate radio broadcast.  Id. Second, the Court held that the televised broadcast of football games was not offered by the defendants as a service of a public accommodation.  The Court observed that, although the defendants were in fact lessors of a stadium (a public accommodation), the broadcasts at issue were not services of that public accommodation.  Id. at 583.  Because the NFL, member clubs and media defendants did not otherwise fall within any of the twelve "public accommodation" categories identified in 42 U.S.C. § 12181(7), the plaintiffs had failed to state a Title III claim.  Id.

Stoutenborough is not analogous to the present case.  Defendants rely on language in Stoutenborough that suggests video broadcasts are not covered under Title III because they are not a "service" that defendant entities operate from a "place" of "public accommodation," id. at 583, but this language is irrelevant to the question we face here.  The Stoutenborough court held as it did because it found that the broadcast of games was not a service of the football stadium—the only

11

identifiable "public accommodation" under the ADA in that suit. Plaintiffs in the

present case, however, are not suing merely to observe a television show; rather,

they seek the privilege of competing in a contest held in a concrete space, a contest

they have been screened out of because of their disabilities.[8]

Defendants urge us to hold, in effect, that so long as discrimination occurs

_____

[8]Defendants also direct our attention to cases in which plaintiffs sued insurance companies alleging discrimination in the insurance policy coverage provided through the plaintiffs' employers and not directly through the insurance company. See, e.g., Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114–15 (9th Cir. 2000) (rejecting Title III claim when plaintiff attempted to sue an insurance company for disability discrimination when her employment disability policy was offered and accessed through her employer instead of the defendant insurance company); Ford v. Schering-Plough Corp., 145 F.3d 601, 612–613 (3d Cir. 1998) (same); Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1011–1014 (6th Cir. 1997) (same). Although these courts recognized that insurance offices were specifically identified as public accommodations under Title III, the denial of relief was based on the fact that the insurance policies at issue were not "service[s] of" the defendant insurance companies, as contemplated by Title III, because they were not offered from the defendants' own offices or facilities. See, e.g., Ford 145 F.3d at 613 (explaining that the "goods, services, facilities, privileges, advantages, or accommodations" to which Title III ensures access should not be treated as "free-standing concepts but rather all refer to the statutory term 'public accommodation' and thus to what these places of public accommodation provide"); Parker, 121 F.3d at 1011 (rejecting plaintiff's claim because there was "no nexus between the disparity in benefits and the services which [the insurance company] offer[ed] to the public from its insurance office").

These cases indicate that, to the extent that a plaintiff intends to raise a claim of disability discrimination based on the kind of insurance offered, the plaintiff must demonstrate that the policy was offered to the plaintiff directly by the insurance company and was connected with its offices, as opposed to its being a privilege provided by the plaintiff's employer.

These cases are as inapposite as is Stoutenborough, supra; they do not stand for the broad proposition that a place of public accommodation may exclude persons with disabilities from services or privileges performed within the premises of the public accommodation so long as the discrimination itself occurs off site or over the telephone. At most, they can be read to require a nexus between the challenged service and the premises of the public accommodation. That nexus is surely present here; Plaintiffs seek access to privileges provided in Defendants' theater. None of the insurance cases countenance, for example, refusal to let individuals in wheelchairs buy insurance policies so long as the company does so by declining to make telephone appointments with disabled customers.

12

off site, it does not offend Title III.  We do not believe this is a tenable reading of Title III; indeed, off-site screening appears to be the paradigmatic example contemplated in the statute's prohibition of "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12182(b)(2)(A)(i).  There would be little question that it would violate the ADA for the Defendants to screen potential contestants just outside the studio by refusing otherwise qualified persons because they were deaf or suffered from diabetes or HIV.

To contend that Title III allows discriminatory screening as long as it is off site requires not only misreading the relevant statutory language, but also contradicting numerous judicial opinions that have considered comparable suits dealing with discrimination perpetrated "at a distance."  For cases arising under the ADA, see, e.g., Ferguson v. City of Phoenix, 157 F.3d 668 (9th Cir. 1998) (hearing-disabled plaintiffs' ADA Title II challenge to 9-1-1 emergency response system that lacked TDD capacity[9]); Bartlett v. N.Y. State Bd. of Law Examiners,

---

[9]Title II of the ADA provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

226 F.3d 69 (2d Cir. 2000) (dyslexic bar exam taker entitled to reasonable accommodations under Title II of ADA).  For cases arising under the Civil Rights Act of 1964, see, e.g., Rousseve v. Shape Spa for Health & Beauty, Inc., 516 F.2d 64 (5th Cir. 1975) (finding a violation where plaintiff's application to join health club was rejected on account of race); Smith v. Young Men's Christian Ass'n of Montgomery, Inc., 462 F.2d 634 (5th Cir. 1972) (application to summer camp denied on account of race); Stout v. Young Men's Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir. 1968) (application to join YMCA denied on account of race).  None of these cases involved a physical barrier erected at the site of a public accommodation or public entity; rather, as in the present suit, they involve discriminatory screening methods used to deny access to a provided good, service, privilege or advantage.

Furthermore, the fact that the plaintiffs in this suit were screened out by an automated telephone system, rather than by an admission policy administered at the studio door, is of no consequence under the statute; eligibility criteria are frequently implemented off site—for example, through the mail or over the telephone.  Indeed, Congress specifically noted in the ADA's "findings of fact" that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects

14

of architectural, transportation, and <u>communication barriers</u>," the very sorts of discrimination the statute seeks to redress. 42 U.S.C. § 12101(a)(5) (emphasis added); <u>see also</u> <u>Ferguson</u>, 157 F.3d 668 (discriminatory 9-1-1 emergency response system).[10]

In light of the foregoing, we conclude that Plaintiffs have stated a valid claim under Title III by alleging that the fast finger telephone selection process is a discriminatory screening mechanism, policy or procedure, which deprives them of the opportunity to compete for the privilege of being a contestant on the Millionaire program. Therefore, we **REVERSE** the district court and remand for further proceedings consistent with this opinion.

---

[10]In addition to arguing that discrimination must occur on site to offend Title III, Defendants construe Plaintiffs' complaint to assert that the automated phone quiz is itself a good or service provided by ABC and Valleycrest. This interpretation, however, does not comport with the complaint itself; Plaintiffs clearly allege that they are seeking to participate on equal terms in the phone quiz only because it is a necessary prerequisite of appearing on the televised contest in which they could potentially win a large sum of money. The phone quiz is therefore a means of access to the public accommodation, not an end in itself.

15