Joel Price is a blind Florida resident. He visited the City of Ocala's website, www.ocalafl.org, but could not access all of it because portions were incompatible with his screen reader. Price is suing the City under Title II of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12131 et. seq. ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").[1] The City argues Price lacks standing because he has no injury-in-fact or threat of immediate future injury.
There is a dearth of case law addressing standing in a case like this: a Title II ADA case in which the alleged violation involves a website. The overwhelming majority of case law addressing ADA website violations involve claims under Title III, which this Court concludes is inapposite to Title II cases. So relying on basic standing principles and this Circuit's case law on ADA standing generally, the Court will explain what factors it finds relevant to determining standing in Title II ADA website cases. After considering those factors, the Court concludes Price lacks standing because there is no threat of immediate future injury.
BACKGROUND
In December 2018, Price visited the City's website, www.ocalafl.org, to "educat[e] himself about the quality of life and governmental functioning in City of Ocala" and "to find out more about programs, services and activities available to visitors and residents of City of Ocala." (Doc. 1, ¶ 33). Some items on the City's website were incompatible with Price's screen reader software, although Price does not specify precisely what documents were inaccessible.[2] The inability to access some documents on the City's website "resulted in Plaintiff suffering from feelings of segregation, rejection, and isolation as Plaintiff was left excluded from participating in the community services, programs and activities offered by City of Ocala in a manner equal to that afforded to others who are not similarly disabled." (Doc. 1, ¶ 34). Price alleges he again visited the City's website on January 20, 2019, but still could not access portions of the website.
Price does not allege where he lives in Florida or that he is a citizen of the City. Nor does he allege that he has any concrete plan to visit or move to the City.
DISCUSSION
The City argues Price lacks standing to bring his claims alleging its website violates Title II of the ADA. While a seemingly straightforward proposition, the issue is more complicated than it appears. So *1268 the Court will discuss standing generally, then address the differences between Title II and Title III ADA cases, then explore the peculiarities of claims involving websites, and finally undertake an analysis of Price's standing.
A. General Principles of Article III Standing
"In every federal case, the party bringing the suit must establish standing to prosecute the action." Elk Grove Unified Sch. Dist. v. Newdow , 542 U.S. 1, 11, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc. , 572 U.S. 118, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). To do so, a plaintiff must demonstrate three things:
First, he must show that he has suffered an "injury-in-fact." Second, the plaintiff must demonstrate a causal connection between the asserted injury-in-fact and the challenged action of the defendant. Third, the plaintiff must show that "the injury will be redressed by a favorable decision." These requirements are the " 'irreducible minimum' required by the Constitution" for a plaintiff to proceed in federal court.
Shotz v. Cates , 256 F.3d 1077, 1081 (11th Cir. 2001) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ; and Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville , 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) ). When seeking an injunction, a plaintiff must also demonstrate "a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury." Id. (emphasis in original); see also Houston v. Marod Supermarkets, Inc. , 733 F.3d 1323, 1328 (11th Cir. 2013). To satisfy the future injury requirement, a plaintiff must espouse more than a "some day" intention. Lujan , 504 U.S. at 564, 112 S.Ct. 2130.
To plead an injury-in-fact, a plaintiff must allege facts showing "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Aaron Private Clinic Mgmt. LLC v. Berry , 912 F.3d 1330, 1336 (11th Cir. 2019) (quoting Lujan , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ); see also Spokeo, Inc. v. Robins , --- U.S. ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (explaining that a plaintiff must "clearly ... allege facts demonstrating each element" (citation and internal quotation marks omitted) ). "While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Fed. Election Comm'n , 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (citation omitted).
B. Distinction between Title II and Title III Standing under the ADA
With that primer, the Court notes that the application of those principles is different depending under which portion of the ADA the claim is brought. "The ADA covers three main types of discrimination, each of which is addressed in one of the statute's three main subchapters: Title I prohibits discrimination in private employment; Title II prohibits discrimination by public entities (state or local governments); and Title III prohibits discrimination by a 'place of public accommodation,' which is a private entity that offers commercial services to the public." A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc. , 900 F.3d 1270, 1289 (11th Cir. 2018). For our purposes, Titles II and III are relevant.
*1269 1. Title II cases and future injury
Title II of the ADA provides that no person with a qualified disability shall "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II, a plaintiff must allege: "(1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.' " Shotz , 256 F.3d at 1079 (quoting § 12132 ).
Most Title II cases in this Circuit that have analyzed whether a plaintiff met the future injury requirement of standing are premised on alleged ADA violations at specific governmental facilities. For instance, in Shotz , plaintiffs alleged they were discriminated against in violation of the ADA at the Levy County Courthouse because one plaintiff was initially told he could not bring his service dog into the courthouse and because of architectural barriers at the courthouse. Id. at 1078-79. In another case, a former patient sued a hospital that failed to provide a professionally trained sign language interpreter. McCullum v. Orlando Reg'l Healthcare Sys., Inc. , 768 F.3d 1135, 1138 (11th Cir. 2014). In both cases, the Eleventh Circuit affirmed dismissal of claims for lack of standing based on the failure of the plaintiffs to show a clear intent to return to the governmental facilities. Shotz , 256 F.3d at 1081-82 ; McCullum , 768 F.3d at 1145-46. There is little case law addressing the future injury requirement in Title II cases not associated with a specific government facility.
2. Title III cases and future injury
Title III prohibits discrimination against the disabled by private entities at "any place of public accommodation." 42 U.S.C. § 12182. To state a claim under Title III, a plaintiff must establish "(1) that the plaintiff is disabled; (2) that the defendant owns, leases, or operates a place of public accommodation; and (3) that the defendant denied the plaintiff-on the basis of the disability-full and equal enjoyment of the premises." Bell v. FTMC, LLC , No. 8:17-CV-3100-T-23AAS, 2018 WL 4565745, at *1 (M.D. Fla. Sept. 24, 2018) (Merryday, J.).
Title III applies to both tangible and intangible barriers to accessing a "place of public accommodation." Rendon v. Valleycrest Prods., Ltd. , 294 F.3d 1279, 1283 (11th Cir. 2002) ; see also J.A.M. v. Nova Se. Univ., Inc. , 646 F. App'x 921, 925 (11th Cir. 2016) ("Title III covers both tangible barriers, that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, and intangible barriers, such as discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges."). Regardless of the barrier, there must be some nexus between the alleged violation and a physical, concrete place of public accommodation. See Rendon , 294 F.3d at 1284 (concluding the plaintiffs stated a claim that a game show's telephone screening system violated Title III and explaining in dicta that plaintiffs had shown a nexus between the discriminatory telephone screening and the physical theater in which the game show was recorded).
In considering the future injury element of standing in Title III cases, district courts in this Circuit apply a four-factor test that this Court will refer to as the Houston factors. The Houston factors are: "(1) the proximity of the defendant's *1270 business to the plaintiff's residence; (2) the plaintiff's past patronage of the defendant's business; (3) the definiteness of the plaintiff's plan to return; and (4) the frequency of the plaintiff's travel near the defendant's business." Houston , 733 F.3d at 1337 n.6 ; see also Silva v. Baptist Health S. Fla., Inc. , 856 F.3d 824, 832 (11th Cir. 2017) (citing Houston and explaining, "In the ADA context, our standing inquiry has focused on the frequency of the plaintiff's visits to the defendant's business and the definitiveness of the plaintiff's plan to return."). The Eleventh Circuit has explained, though, that these Houston factors are not exclusive, and no factor is dispositive. Houston , 733 F.3d at 1337 n.6.
So a primary difference between Title II and III claims is that Title III claims require that there be a "place of public accommodation," while Title II claims have no such requirement. Instead, Title II broadly applies to "services, programs, or activities of a public entity."
C. Whether ADA Website Claims Should Have Different Standing Considerations
Recently there have been an explosion of cases-under both Title II and III-alleging that websites violate the ADA. Usually, they arise in the context of websites either failing to be compatible with screen reader software or failing to have closed captioning for videos. Courts have struggled to apply traditional principles of standing to these website cases and have disagreed about what features a website must have to comply with the ADA. The latter is largely due to a complete lack of rules and regulations being promulgated by the Department of Justice despite being aware of this issue for years.[3] That *1271 said, as far back as 2011, the DOJ explained its position on the ADA's relation to the Internet:
Although the language of the ADA does not explicitly mention the Internet, the Department has taken the position that title II covers Internet Web site access. Public entities that choose to provide services through web-based applications (e.g., renewing library books or driver's licenses) or that communicate with their constituents or provide information through the Internet must ensure that individuals with disabilities have equal access to such services or information, unless doing so would result in an undue financial and administrative burden or a fundamental alteration in the nature of the programs, services, or activities being offered. ... [A]n agency with an inaccessible Web site may also meet its legal obligations by providing an alternative accessible way for citizens to use the programs or services, such as a staffed telephone information line.
28 C.F.R. § Pt. 35, App. A. So while Title II undoubtedly applies to websites, there is no guidance from the DOJ about what a government entity must do to make its website ADA compliant.
With that background, the Court will address the growing case law discussing Title III website cases and will then explain why that case law is largely inapposite to Title II website cases-for which there is little guidance. Finally, the Court will propose a workable solution for addressing standing in Title II website cases.
1. Pleading Title III website cases
Most of the ADA website case law involves violations of Title III. These cases have been primarily concerned with two issues that both go to whether a plaintiff has stated a claim.[4] First, the cases consider whether a website is a "place of public accommodation" such that it is governed by the ADA. Compare Access Now, Inc. v. Sw. Airlines, Co. , 227 F.Supp.2d 1312 (S.D. Fla. 2002) (concluding an airline's website was not a "place of public accommodation"); with Robles v. Domino's Pizza, LLC , 913 F.3d 898, 904 (9th Cir. 2019) (concluding business website and app were "places of public accommodation").
Second, courts in this Circuit have considered what a plaintiff must allege to establish a nexus between a website and "place of public accommodation" such that a website claim is actionable. See e.g. Price v. Everglades College, Inc. , No. 6:18-CV-492-ORL-31GJK, 2018 WL 3428156, at *2 (M.D. Fla. July 16, 2018) (explaining that there must be a nexus between a website and a brick-and-mortar place for an actionable Title III claim); and Haynes v. Dunkin' Donuts LLC , 741 F. App'x 752, 754 (11th Cir. 2018) (holding a plaintiff stated a claim by pleading "the alleged inaccessibility of Dunkin' Donuts' website denies Haynes access to the services of the shops that are available on Dunkin' Donuts' website"). When considering whether there is a nexus, courts distinguish between "an inability to use a website to gain information about a physical location and an inability to use a website that impedes access to *1272 enjoy a physical location," with only the latter being sufficient to state a claim. Everglades College, 2018 WL 3428156, at *2 (explaining that a contrary view "would require all websites with any nexus to a physical public accommodation to be formatted in such a way that they are accessible to screen reader software.")
But those cases, which make up the majority of the case law, do not address standing. In the few cases that have addressed standing in Title III website cases, district courts have applied the Houston factors[5] to determine whether a plaintiff has pleaded a future injury. See e.g. Price v. Orlando Health, Inc. , No. 6:17-CV-1999-ORL-40DCI, 2018 WL 6434519, at *4 (M.D. Fla. Dec. 7, 2018) (finding plaintiff had not alleged a future injury related to a hospital website because of the distance between his house and the "place of public accommodation," his failure to travel to the area frequently, and his lack of definite plan to return); and Honeywell v. Harihar Inc. , No. 2:18-CV-618-FTM-29MRM, 2018 WL 6304839, at *3 (M.D. Fla. Dec. 3, 2018) (concluding a plaintiff pleaded a future injury related to a hotel's website by alleging she intended to travel from Fort Lauderdale to Fort Myers within six months).
As a review of the above cases shows, courts cannot agree on how to apply traditional Title III case law to website cases. There is disagreement about when a website impedes access to a physical location, or whether a plaintiff must actually visit a "place of public accommodation" to state a claim after having visited a website. And that is to say nothing of the uneven application of the Houston factors in Title III website cases. Guidance is sorely needed in this arena.
2. Title II website cases and the problem with reliance on Title III case law
While district courts are, at the very least, beginning to flesh out these issues in Title III website cases, there has been little discussion of what it takes to satisfy standing or to state a claim in Title II website cases. The only case in this Circuit of which this Court is aware of that has directly addressed these issues is Gil v. Broward Cty., Fla. , No. 18-60282-CIV, 2018 WL 4941108 (S.D. Fla. May 7, 2018) (Dimitrouleas, J.). But that Court, without explanation, applied Title III case law to a Title II claim-essentially lumping together all ADA cases involving alleged website violations. Id. , at *2 ("The Court has set forth the standard applicable to Title III website cases, and the Court finds that analysis instructive in this Title II case."). The problem with this one-size-fits-all approach is best illustrated via some examples.
First, let us consider standing in Title II website cases. The Houston factors district courts have struggled to apply in Title III website cases are largely inapplicable to proving a future injury in Title II website cases because there is no requirement that a violation be tied to a physical location.[6] What is the proximity of a plaintiff's residence to a governmental website, and what does it mean to frequently travel near a website? For that matter, what does it mean to patronize a website, or to have a *1273 plan to return to the website? And does it matter that a Title II plaintiff has no connection with the governmental entity that's website is the subject of the lawsuit? The lack of clear answers to these questions-or perhaps the obvious answers-demonstrate the problems of applying general Title III standing principles in Title II website cases.
Likewise, reliance on Title III website case law on how to state a claim is misguided because requiring a nexus between a governmental website and an impediment to accessing a physical, brick-and-mortar location makes no sense under Title II. Again, Title II has no statutory requirement that a violation be connected to a physical location. So the requirement that a website impede access to a physical location to be actionable cannot be applicable. For this and various other reasons, this Court concludes Title III case law on standing and what is needed to state a claim is largely inapplicable to Title II website cases.
3. A workable solution for Title II website cases
Having identified the problems with applying Title III case law in Title II website cases, the question arises: what factors are relevant for courts to consider in when ruling on a motion to dismiss a Title II website claim based on lack of standing? Rather than tackle this unenviable task by reinventing the wheel, the Court concludes general standing principles should act as the touchstone.
It is undisputed that a Title II plaintiff must have Article III standing to state a justiciable claim. Berry , 912 F.3d at 1339 ("[I]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing," quoting Spokeo , 136 S.Ct. at 1547-48 ). That means a plaintiff must have a concrete and particularized injury-in-fact, and a real and immediate threat of future harm to have standing to bring a Title II claim based on a governmental entity's website.[7] Lujan , 504 U.S. at 560, 112 S.Ct. 2130 ; Shotz , 256 F.3d at 1081.
The Supreme Court recognized, though, that " '[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing....' " Havens Realty Corp. v. Coleman , 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (quoting Warth v. Seldin , 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ). In other words, certain statutes can create an Article III injury-in-fact for "testers."
In Tandy v. City of Wichita , 380 F.3d 1277 (10th Cir. 2004), the Tenth Circuit Court of Appeals applied this reasoning to conclude that "testers have standing to sue under Title II of the ADA." Id. at 1287. The Eleventh Circuit has adopted Tandy 's reasoning, though not explicitly in Title II ADA claims. See Houston , 733 F.3d at 1332-34 (applying Tandy 's reasoning in Title III ADA cases). So this Court can conclude that the Eleventh Circuit would hold that a tester has standing to bring a claim under Title II of the ADA.
But although a Title II tester (likely) has satisfied the injury-in-fact requirement by discovering an ADA violation, the tester still must articulate a real and immediate threat of future injury to have standing. And as the Supreme Court explained, this threat of future injury must be based on *1274 more than just a "some day" intention. Lujan , 504 U.S. at 564, 112 S.Ct. 2130.
As explained in section B.1. supra , most of the Title II case law from this Circuit addressing the future injury requirement involved violations at governmental facilities and considered the plaintiffs' intentions to return to those facilities. See Shotz, 256 F.3d at 1081-82 ; McCullum , 768 F.3d at 1145. Those cases, though, provide no guidance in website cases where there is no facility to which to return.
This Court, then, must determine what considerations are relevant.[8] As with Title III cases and other areas of law, the Court concludes that the totality of the relevant facts should be considered when determining whether there is an immediate threat of future injury. See Houston , 733 F.3d at 1337, n.6. And while considering the totality of relevant facts, the Court concludes the following non-exclusive, non-dispositive factors will likely be worth consideration in most Title II website cases. Id.
The first factor the Court considers relevant is what ties or connections a plaintiff has to the defendant governmental entity. It is this Court's experience that most governmental websites provide services to that governmental entity's constituents, not to the world at large. Without a link between the plaintiff and the governmental entity-e.g. , the plaintiff is a citizen or lives nearby, the plaintiff has concrete plans to relocate to within that government's bounds or visit it, the plaintiff has family or friends who are citizens whom depend on the plaintiff, etc.-this factor would weigh against an immediate threat of future injury.[9] This factor appears to be consistent with the DOJ's acknowledgement the governmental websites primarily serve to communicate with the governmental entity's constituents. 28 C.F.R. § Pt. 35, App. A.
Another factor to consider is what information about a government entity's "services, programs, or activities" on the website is allegedly inaccessible.[10] There is a difference between inaccessible information about current governmental services, programs, or activities, and merely archival information. For instance, if a county's public events calendar from 2015 is inaccessible on its website, that poses a lesser (or no) risk of future harm compared to a situation in which the current public events calendar is inaccessible. Here's another example: failure to properly code a photograph from a meeting that renders the photograph incompatible with a screen reader poses a lesser (or no) risk of future harm as compared to having a future *1275 meeting agenda being inaccessible. In other words, the type of information that is inaccessible is relevant to determining whether there is an immediate risk of future harm.
Last, how the inaccessibility injures a plaintiff is relevant to determining whether there is a risk of immediate future harm. Many ADA website cases involve testers ferreting out inaccessible portions of a website, and then claiming they have been harmed solely by being unable to access that portion of the website. This differs from a claim that a portion of a website is inaccessible, which then prevents a plaintiff from participating in or benefiting from some governmental service or activity. For example, in Hindel v. Husted , No. 2:15-CV-3061, 2017 WL 432839, at *2 (S.D. Ohio Feb. 1, 2017), Ohio's voter services website was allegedly inaccessible via screen readers, which hindered the abilities of citizens with vision impairments from registering to vote or using other services on the website. And in Martin v. Metro. Atlanta Rapid Transit Auth. , 225 F.Supp.2d 1362, 1366 (N.D. Ga. 2002), Atlanta's public bus system's routes and schedules on its website were inaccessible to the vision impaired, which prevented those persons from using the bus system in an equal manner to those without vision impairments. This factor would also encapsulate services on government websites that allow citizens to do things like apply for and renew licenses, or pay fees or fines. In these cases, the future harm was not the inaccessibility of the information itself; rather, it was the effect that the inaccessibility had on the plaintiff's ability to use the information for its intended purpose.
In sum, here are three factors this Court has identified, which should be considered along with the totality of the relevant facts: (1) plaintiff's connection with the defendant governmental entity; (2) the type of information that is inaccessible; and (3) the relation between the inaccessibility and a plaintiff's alleged future harm. This Court considers none of these factors to be dispositive, nor are they exclusive.[11]
D. Analysis of Price's Standing under Title II
With this framework established, the Court turns to the City's Motion to Dismiss. In it, the City brings a facial attack against Price's Complaint, arguing he has not alleged an injury-in-fact or future injury.[12] (Doc. 7, n.1) (explaining that the City must "constrain itself to the four corners of Plaintiff's Complaint"). In a facial attack as presented here, the Court "must evaluate standing based on the facts alleged in the complaint."[13] Shotz , 256 F.3d at 1081. That said, the Court cannot "speculate concerning the existence of standing" or "piece together support for *1276 the plaintiff." Id. (citing Cone Corp. v. Florida Dept. of Transp. , 921 F.2d 1190, 1210 (11th Cir. 1991).
Price alleges the following in the Complaint:
• He is a resident of Florida, but does not state in which city or county he lives, (Doc. 1, ¶ 13);
• He "is interested in the quality of life, level of environmental concern with particular interest in response to hurricane preparation and aftermath, historic preservation and the economical and touristic growth which would make City of Ocala a viable visiting and living option," (Doc. 1, ¶ 32);
• In December 2018, he "visited Defendant's Website with the intent of educating himself about the quality of life and governmental functioning in City of Ocala. Plaintiff also wanted to find out more about programs, services and activities available to visitors and residents of City of Ocala," (Doc. 1, ¶ 33);
• The electronic documents[14] on the City's website are not in a format accessible to the blind or persons with visual impairments, (Doc. 1, ¶ 34);
• He could not become informed about the City, which "resulted in Plaintiff suffering from feelings of segregation, rejection, and isolation as Plaintiff was left excluded from participating in the community services, programs and activities offered by City of Ocala in a manner equal to that afforded to others who are not similarly disabled," (Doc. 1, ¶ 34);
• On January 20, 2019, he "again attempted to access Defendant's electronic documents, but those electronic documents remained inaccessible," (Doc. 1, ¶ 37);
• His "inability to access Defendant's electronic documents has resulted in a virtual barrier which has impaired, obstructed, hindered, and impeded Plaintiff's ability to become an involved citizen in City of Ocala government and learn about the programs, services and activities available to residents to (and visitors of) City of Ocala," (Doc. 1, ¶ 42);
• He "continues to desire to become involved in and monitor the Palm Beach County[15] [sic] governmental process," (Doc. 1, ¶ 44);
• He "has concrete plans to read and comprehend (on a weekly basis) the electronic documents supplied by Defendant as a service to the public." (Doc. 1, ¶ 45).
*1277 Based on these allegations, the Court concludes that Price has not established that he has standing because there is no support that there is an immediate threat of future injury. None of the three factors the Court identified above-(1) plaintiff's connection with the defendant governmental entity; (2) the type of information that is inaccessible; and (3) the relation between the inaccessible information and a plaintiff's alleged future harm-support Price's standing.
For the first factor, Price alleged no meaningful connection to the City. First, he does not allege that he is a constituent of the City. Second, he alleges that he is interested in learning information to determine if the City is worth visiting or moving to, but he alleges no concrete plans to do either. These are the sort of "some day" allegations that are insufficient to allege a future injury. Lujan, 504 U.S. at 564, 112 S.Ct. 2130. Last, Price alleges no other ties to the City, such as dependent friends or family who live there. So the Court concludes this factor weighs against Price having an immediate threat of future injury.
The second factor also weighs against Price. Price failed to allege what specific information was inaccessible to him on the City's website. As noted, the Court cannot speculate or piece this information together for Price, so this factor weighs against Price having an immediate threat of future injury.[16]
Finally, the third factor weighs against Price. His only allegation of harm is that he in unable to access the information, which "impaired, obstructed, hindered, and impeded Plaintiff's ability to become an involved citizen in City of Ocala government and learn about the programs, services and activities available to residents to (and visitors of) City of Ocala." (Doc. 1, ¶ 42). Price fails to allege any specific way that the inaccessible information hindered his ability to be involved with the City's government, making this generic allegation too conclusory to merit much weight. Instead, it is akin to an allegation that he was harmed by the inaccessibility of the information itself. So the Court concludes this factor weighs against Price having an immediate threat of future harm.
Based on the above, the Court agrees with the City that Price lacks standing to pursue his claims. But because the Court has articulated new considerations of which Price was unaware when he filed the Complaint, the Court deems it appropriate to allow Price an opportunity to amend his Complaint to reallege standing (and to state a claim under Title II) if he can do so. So the Court will dismiss the Complaint without prejudice to Price filing an amended complaint within fourteen days.
Accordingly, it is ORDERED AND ADJUDGED that:
1. Defendant City of Ocala's Motion to Dismiss (Doc. 7) is GRANTED.
2. Plaintiff Joel Price may file an amended complaint within fourteen (14) days from the date of this Order. Failure to do so will result in this case being dismissed without further notice.
DONE and ORDERED in Tampa, Florida, this 22nd day of April, 2019.

"Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ. , 877 F.3d 979, 985 (11th Cir. 2017) ; A.R. v. Dudek , No. 12-60460-CIV, 2014 WL 11531370, at *3 (S.D. Fla. Nov. 13, 2014), report and recommendation adopted , No. 12-60460-CIV, 2014 WL 11531887 (S.D. Fla. Dec. 29, 2014) (analyzing ADA and Section 504 standing challenge together). Because the same analysis applies to both claims, the Court will refer to Price's claims simply as a Title II ADA claim.

In Exhibit A to the Complaint, Price wrote the City of Ocala asking that certain categories of documents be made accessible on the website. Specifically, he says he was "interested in documents related to the budget of the City of Ocala (electronic documents) for 2018, 2017, 2016 and 2015 and all City Council agendas and back up material for year 2018, 2017 and 2016." (Doc. 1-1). Despite this generic description, it is unclear to what precise documents on the City's website Price is alleging are inaccessible.

The following quote from an Eastern District of New York court perfectly sums up the failure of the DOJ to provide clarity as to the ADA's application to the Internet:
Despite being queried by members of Congress nearly two decades ago on the issue of whether website accessibility falls under the ADA, see Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996), the DOJ has still not promulgated rules related to this specific issue. The DOJ, the agency tasked with promulgating regulations implementing the ADA, see 42 U.S.C. § 12186(b), issued an Advance Notice of Proposed Rulemaking ("ANPRM") seven years ago stating that it was "considering revising the regulations implementing title III of the [ADA] in order to establish requirements for making the goods, services, facilities, privileges, accommodations, or advantages offered by public accommodations via the Internet, specifically at sites on the World Wide Web (Web), accessible to individuals with disabilities." Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, 75 Fed. Reg. 43460-01, 43460, 2010 WL 2888003 (July 26, 2010). No rule or regulation emerged from the ANPRM. Prompted by changes to "the Internet, accessibility tools, and assistive technologies," on April 29, 2016, the DOJ withdrew the ANPRM and issued a Supplemental Advance Notice of Proposed Rulemaking ("SANPRM"). Department of Justice, Statement Regarding Rulemaking on Accessibility of Web Information and Services of State and Local Government Entities (Apr. 29, 2016), available at https://www.ada.gov/regs2016/sanprm_statement.html (last visited on June 23, 2017). The SANPRM only sought input on accessibility guidelines related to the websites of entities covered by Title II of the ADA. Development of website accessibility rules for entities covered by Title III is proceeding on a separate track. See id. ("The Department received approximately 400 public comments addressing issues germane to both titles II and III in response to the 2010 ANPRM. Upon review of those comments, the Department announced in 2015 that it decided to pursue separate rulemakings addressing Web accessibility for titles II and III. The Department is moving forward with rulemaking under title II first."). It is unknown when a similar notice related to regulations concerning Title III entities will be issued.
Andrews v. Blick Art Materials, LLC , 268 F.Supp.3d 381, 402-03 (E.D.N.Y. 2017).

While the City does not argue that Price failed to state a claim-instead arguing only that he lacks standing-it is worthwhile to discuss this case law to explain how it interacts with the Houston factors in Title III ADA cases and because many courts have conflated these issues when discussing ADA website cases. Moreover, the issues of standing and stating a claim go hand-in-hand since a plaintiff must satisfy both to survive a motion to dismiss.

Again, those factors are: "(1) the proximity of the defendant's business to the plaintiff's residence; (2) the plaintiff's past patronage of the defendant's business; (3) the definiteness of the plaintiff's plan to return; and (4) the frequency of the plaintiff's travel near the defendant's business." Houston , 733 F.3d at 1337 n.6.

In this respect, the Court agrees with Price, who argues that Title III standing cases are inapplicable to Title II cases for this very reason. (Doc. 10, pp. 13-15).

The Court focuses solely on the injury-in-fact and future injury requirements because those issues are raised in the City's Motion, but the other standing requirements are no less essential.

This is far from a groundbreaking conclusion. After all, that is exactly what happened in the Title III context with the Houston factors.

Some might argue that this factor should not be considered, especially if the plaintiff is a Title II tester. The Court disagrees. While the Eleventh Circuit recognized that testers in Title III cases have suffered an injury-in-fact, it considered the Houston factors-proximity, past patronage, concrete plans for future visits, and frequency of travel near "place of public accommodation"-to determine whether the tester had an immediate threat of future injury. 733 F.3d at 1336. Similarly here, a Title II tester would likely have suffered an injury-in-fact, but this and the remaining factors would be relevant to determining whether the tester had an immediate threat of future injury to satisfy Article III's standing requirements.

Obviously, the inaccessible information must relate to a government service, program, or activity to state a claim under Title II. Shotz , 256 F.3d at 1079. So it follows that if a plaintiff fails to allege what information is inaccessible, then the plaintiff failed to state a claim.

In proposing these factors, the Court is aware that "[t]he ADA was enacted to provide a national mandate for the elimination of discrimination against individuals with disabilities ... and must be broadly construed." Kornblau v. Dade County, 86 F.3d 193, 194 (11th Cir.1996) (quotation marks and citation omitted). Having given great consideration to these issues, the Court concludes these factors impose no greater burden on a Title II plaintiff than the Houston factors impose on a Title III plaintiff, and so concludes that they do not violate the ADA's mandate.

This argument is based on Price's failure to allege what documents are inaccessible, (Doc. 7, p. 5); Price's failure to allege he has an intent to visit any of the City's facilities, (Doc. 7, p. 7); and Price's lack of geographic proximity to the City. (Doc. 7, p. 8).

Given the City's numerous citations to facts outside of the Complaint, it is unclear why the City did not raise a factual attack on Price's standing, which would have allowed the Court to consider this additional information.

As explained in the Background section, supra, it is unclear to what inaccessible documents Price is referring. He cites more than a dozen links to the City's website (Doc. 1, nn. 4-24), but never states that the documents in those links are inaccessible as opposed to implying that those links are representative of the type of information available on the City's website. But there is support for the latter position because, in a letter Price sent the City about inaccessible documents, he never mentions most of the documents to which he provides links. (Doc. 1-1). Regardless, as noted above, the Court cannot speculate to create standing or piece together support for Price's standing. Shotz, 256 F.3d at 1081. So the Court reads the Complaint to generally allege that documents on the website are inaccessible without specifying the documents to which he is referring.

Price's counsel appears to have inadvertently neglected to change this paragraph to reflect the governmental entity Price is suing in this suit. The Court construes this as a mere scrivener's error and understands this allegation to refer to the City of Ocala-not Palm Beach County.

While the issue is not currently before the Court, had the City argued that Price failed to state a claim under Title II, the Court would have granted the Motion on that basis as well.